**In the Matter of K.A.**

**Nos. 83–799, 83–800.**

District of Columbia Court of Appeals.

Argued June 6, 1984.
Decided Nov. 20, 1984.

Albert Brick, Washington, D.C., for J.P.A. (natural parent).

Stephen H. Meyer, Washington, D.C., for J.A. (natural parent).

Beth Goodman, Law Student Counsel (LS # 3562), with whom Donna Wulkan, Supervising Atty., Antioch School of Law, Washington, D.C., was on brief, for K.A.

Karen J. Krueger, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for District of Columbia.

Before NEBEKER, BELSON and TERRY, Associate Judges.

NEBEKER, Associate Judge:

The parents of K.A. challenge the termination of their parental rights. Before us now, they argue that the trial court erred in concluding that there was sufficient record evidence to support the termination order. They also urge that the Code's parental rights termination provision, D.C. Code § 16–2353(b)(1)–(4) (1981), violates constitutional due process protections. We affirm.

I

K.A., a female, was born in June 1975. Five years later, K.A.'s natural mother abandoned the family, leaving K.A.'s care and custody to her natural father. Soon thereafter, the father left K.A. for several weeks in the care of his friend's mother. Becoming concerned about the father's whereabouts and the child's continued well-being, the caretaker called upon the District of Columbia Department of Human Services (DHS). The father, however, soon returned and resumed care of K.A. In mid-October, 1980, K.A. was once again left for a short period of time in the care of the friend's mother and again DHS was called regarding the same concerns.

Within a week of this event, K.A. and her father were involved in a brush with the law that resulted in his incarceration

for several months. His absence precipitated DHS's intervention. The father refused to comply with DHS's request to place K.A. in emergency care; DHS was nonetheless able to get her placed in a foster home by order of the Superior Court. DHS then filed a neglect action. The trial court found her a neglected child under D.C. Code § 16–2301, *et seq.* (1981), committed her to DHS's custody for up to two years, afforded both parents visitation rights but required them to undertake counseling as a precondition to either's resumption of custody. From the time of the neglect adjudication on March 19, 1981, until February 28, 1983, when this termination action was initiated, hearings were conducted every six months pursuant to § 16–2353, to review the commitment order. All the while K.A. remained in the same foster home.

By its order of May 9, 1983, the trial court terminated the parental rights, with respect to K.A., of both her mother and father. Based on testimony of a child psychologist, two DHS social workers, K.A.'s foster mother, her natural parents and K.A. herself, the court concluded that there was clear and convincing evidence that: (1) continuity and stability of care were lacking in the custody of her father but not under the care of the foster parents; (2) her physical and emotional health would be best served by a termination of rights; (3) the quality of her interaction with her natural parents, particularly her father, was good, but her parents took advantage of visitation rights very infrequently, while K.A.'s interaction with her foster family was very good; and (4) she expressed a desire to stay with her foster parents.

## II

### A.

■ Appellants urge that there is not sufficient evidence to support the trial court's conclusion that the statutory requirements have been proven by clear and convincing evidence. Although this case is not easily resolved, especially with respect to the father, based upon our standard of review we detect no reversible error in this regard.

■ Section 16–2353(b) sets out four factors that delineate the best interests of the child for termination purposes: (1) the need for continuous and stable care, caretakers and home environment; (2) the health of all persons involved with the child, and the child's health; (3) the quality of the interaction and relationships between the child and those involved with her; (4) the child's opinion, if feasible to solicit it.[1] Proofs made in a termination proceeding must satisfy the clear and convincing evidentiary standard. *Id.* § 16–2359(f); *Santosky v. Kramer,* 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982). Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt. *Addington v. Texas,* 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1807–08, 60 L.Ed.2d 323 (1979);

1. Section 16–2353 reads in its entirety as follows:

(a) A judge may enter an order for the termination of the parent and child relationship when the judge finds from the evidence presented, after giving due consideration of the interests of all parties, that the termination is in the best interests of the child.

(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent; and

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter.

McCormick, Law of Evidence § 796 (2d ed. 1972) ("No high degree of precision can be attained by th[is] group of adjectives.").

■ Perhaps most significant for our analysis in this case is a clear understanding of our standard on review. Appellants appear to want to reargue, on appeal, whether DHS has met its burden of proof. This, however, is not within our province. *Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 282, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966); D.C. Code § 17–305(a). Rather, we must satisfy the concern that there is sufficient record evidence such that the possibility of an erroneous judgment does not lie in equipoise between the two sides (the preponderance standard). On the other hand, we need not require the evidence be so compelling so as to exclude as nearly as possible the likelihood of a decision that erroneously terminates parental rights. *Addington v. Texas, supra,* 441 U.S. at 423, 99 S.Ct. at 1807.

### B.

■ As to the father, the evidence from the social workers and the psychologist is almost overwhelming that the child's need for continuity of care and caretakers and her integration into a stable and permanent home environment was not supplied by him. His prospective ability to address day care and suitable living arrangements was put into much doubt by the testimony of his most recent DHS social worker. Even crediting, *arguendo,* his argument that his ability to formulate suitable plans for K.A. had been thwarted, in part, by actions of the unsympathetic social worker, we nonetheless conclude that there was sufficient evidence to support the trial court's conclusion regarding § 16–2353(b)(1).

■ Under foster care, K.A.'s physical health improved as vision and allergy problems were addressed. More significantly, testimony from the psychologist established that her mental and emotional health considerably improved once she was placed in the foster home. Furthermore, in his opinion, termination of parental rights would be healthful for her in the long run while separation in the near future from her foster home certainly would not be. Thus, the physical, mental and emotional needs, in increasing order of importance, were by no means best met by the father. *Id.* § 16–2353(b)(2).

■ The quality of the interaction criterion, § 16–2353(b)(3), provides the father with his strongest argument in that nearly all the witnesses testified that K.A. and her father had a close relationship during periods of his presence with her. However, the trial court appropriately pointed out that the father visited K.A. very. infrequently, eight times in her three years in foster care. Moreover, K.A. also enjoyed a close relationship with the members of her foster family. The trial court candidly admitted difficulty in deciding with respect to this criterion. Though this could reflect a reasonable doubt, the applicable standard does permit close issues to be definitively decided so long as the risk of factual error falls within the range of tolerable potential error that we referenced above.

■ Finally, the child testified under arrangements that were agreed upon by counsel for all the parties. *Id.* § 16–2353(b)(4). These appearances are inherently difficult, and the resulting testimony is hardly expected to be the model of clarity or consistency. Nonetheless, K.A. testified that she did not want to live with her natural father again; she wanted to live with her foster parents. Thus, we are constrained to find no error.

### C.

■ The natural mother's sufficiency contention is not as difficult to resolve. The record firmly establishes that: the mother abandoned K.A. at age five; she has not assumed care or custody of K.A. since; she has exercised visitation rights only six times since foster care began; she appears to have an alcohol problem; she has not taken affirmative steps to address

personal and professional problems which affect her ability as a parent; her interaction with K.A. has been observed as not totally positive; and she is not K.A.'s expressed preference. Accordingly, we find no error in the trial court's termination decision in this regard.

### III

The father argues that a custodial parent has greater due process rights in a termination determination than does a non-custodial parent in view of the sanctity of an existing family unit. He further argues, we think despite obvious contrary indications in the record, that he should be considered a custodial parent because the government significantly interfered with the custodial relationship between K.A. and him. We decline to decide his legal argument[2] because we conclude that, factually, a challenge by a custodial parent is not the case before us now.

In its order of May 9, 1983, the trial court's factual findings regarding the neglect adjudication, the commitment of K.A. into DHS's care, and the ongoing, periodic review hearings spanning nearly three years of foster care all reveal that K.A.'s father has not been her custodian for a long time. *Cf. In re P.G.*, 452 A.2d 1183, 1185 (D.C.1982). The father attempts to argue that his separation from K.A. and the commitment to foster care were a result of actions by organs of the District government. Although the constitutional attack on § 16–2353(b) is raised for the first time on appeal, we have elected, *Foster v. United States*, 290 A.2d 176, 177 (D.C.1972), to review the question of law; but we refuse to overturn or disregard applicable findings of fact made by the trial court. None of the trial court's findings in any way intimates such interference occurred. Moreover, since the evidentiary sufficiency challenges have precipitated a full record review, we note that we have not detected any such unfair or overbearing interference.

Appellants also attack § 16–2353(b), contending that a finding of parental unfitness is required by the due process clause of the Fifth Amendment, *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (relationship of due process rights under the Fourteenth Amendment and due process rights applicable to the District of Columbia guaranteed under the Fifth Amendment), as a prerequisite for a termination order. Our response is based on *stare decisis* and statutory construction. In large measure, appellants invite us to overrule *In re P.G., supra*, and the authority cited therein; alternatively, the father urges us at least to distinguish his case from *In re P.G.* because of the asserted existence of a custodial natural parent. We decline to do the former and fail to find the distinctions required to accomplish the latter. We reaffirm our understanding of *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), and *Santosky v. Kramer, supra*, in *In re P.G.* As we indicated at note 2, *supra*, in *In re P.G.* we did not read *Quilloin v. Walcott, supra*, as requiring an unfitness finding, particularly where the natural parent no longer has

---

**2.** *But see Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978):

We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment). But this is not a case in which the unwed father at any time had, or sought,

actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the "best interests of the child."

custody. *In re P.G., supra,* 452 A.2d at 1184–85. And we read *Santosky v. Kramer, supra,* as a procedural due process case which established the evidentiary burden in termination proceedings. *In re P.G., supra,* 452 A.2d at 1185. Appellants' urgings to the contrary are unpersuasive.

 In addition to the precedential rationale, a straightforward reading of § 16–2353(b) reveals that a concern over the natural parents' unfitness inheres in this analysis. Continuity of care, stability and permanence of home environment, physical, mental and emotional health, interactions and interrelationships, and the child's judgment on the ultimate question all focus on fitness. These considerations must be, and in this case were, analyzed with respect to the natural parents. Appellants argue that the importance of parental interests tilts the balance pans, when the state's and the child's interest are counterpoised, such that a discrete and preemptory unfitness finding is required. We, however, are persuaded that § 16–2353(b) properly balances all the constitutionally cognizable interests at stake in this case. *Quilloin v. Walcott, supra,* 434 U.S. at 255, 98 S.Ct. at 554; *In re P.G., supra,* 452 A.2d at 1184; *see In re Montgomery,* 311 N.C. 101, 316 S.E.2d 246, 251–52 (1984); *Knox v. Lynchburg Division of Social Services,* 223 Va. 213, 288 S.E.2d 399, 404 (1982); *In re Fay,* 120 N.H. 153, 412 A.2d 1012, 1015 (1980) (dominant consideration is welfare of the child which must prevail over conflicting rights of parent; court ordered psychiatric exam of parent facing termination proceeding); *In re William L.,* 477 Pa. 322, 383 A.2d 1228, 1236, *cert. denied,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978) (approvingly citing *In re J.S.R.,* 374 A.2d 860 (D.C.1977)); *see also Woodruff v. Keale,* 64 Hawaii 85,

637 P.2d 760, 769 (1981); *Bennett v. Jeffreys,* 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277 (1976); *contra, In re Baby Girl K.,* 113 Wis.2d 429, 335 N.W.2d 846, 855 (1983), *appeal dismissed,* —— U.S. ——, 104 S.Ct. 1262, 79 L.Ed.2d 670 (1984); *In re Five Minor Children,* 407 A.2d 198, 199 (Del.1979), *appeal dismissed,* 450 U.S. 382, 101 S.Ct. 1495, 67 L.Ed.2d 312 (1981) ("The State cannot terminate parental rights by showing it is in the best interests of the children without showing the parents were unfit."); *Kottsick v. Carlson,* 241 N.W.2d 842, 853–54 (N.D.1976).

Given the foregoing analysis, we do not wish to rule out, just as the Supreme Court in *Quilloin v. Walcott* did not want to preclude, a more prominent role for a concern for the natural parents' rights, if and when the case demands. Where custodial parents' rights are threatened with possible termination, it may be appropriate for the court to analyze the four statutory factors spelled out in § 16–2353(b) first with respect to the natural parents facing rights termination. And only if the results of that analysis are unsatisfactory would the court then proceed to apply the factors to the other, potential custodians seeking parental status. But that is for another case on another day.

Finding no error, the order of the trial court is

*Affirmed.*