Appeal of U.S.W.

In the Matter of C.E.W.

No. 86–97.

District of Columbia Court of Appeals.

Submitted Oct. 7, 1987.
Decided May 11, 1988.

Ruth Harthoorn, Washington, D.C., appointed by this court, was on the brief for U.S.W.

Catherine Bierman, appointed by this court, was on the brief for C.E.W.

Before BELSON, TERRY and ROGERS, Associate Judges.

PER CURIAM:

Appellant U.S.W., the natural but noncustodial father of C.E.W., appeals from a trial court order terminating his parental rights. U.S.W. argues that there was insufficient evidence to support the trial court's termination of parental rights. We find this argument unpersuasive, and therefore affirm.

C.E.W. was born on March 5, 1981. At birth, C.E.W. suffered from fetal alcohol syndrome and fetal hydantoin syndrome, resulting in special needs for occupational and physical therapy. Three weeks after his birth, C.E.W. was placed in the shelter care of the Department of Human Services (DHS) and, on December 9, 1981, he was adjudicated "neglected" pursuant to D.C. Code § 16–2320(a) (1981). C.E.W. has been living in a foster home since that time, and his foster parents have received special training to make them better able to meet the child's needs. C.E.W. is developmentally delayed in most areas, including speech, language, and social behavior, and he requires comprehensive special education services. According to expert testimony, these special needs, coupled with the existence of residual parental rights in C.E.W.'s natural parents, make it substantially harder to find adoptive parents for C.E.W.

■ A trial court may terminate a parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the interests of all parties, that the termination is in the best interest of the child. D.C.Code § 16–2353(a) (1981). In making this determination, the trial court must consider the child's need for continuity of care and timely integration into a stable and permanent home; the physical, mental, and emotional health of all persons involved to the degree that the child's welfare is affected, the decisive consideration being the needs of the child; the quality of the interaction and interrelationship of the child and his parents, siblings, caretaker and foster parents; and the child's opinion, to the extent feasible. *See* D.C.Code § 16–2353(b); *In re K.A.*, 484 A.2d 992, 995 (D.C.1984); *In re K.J.L.*, 434 A.2d 1004, 1006 (D.C.1981).

In this case, the trial court found that, in light of C.E.W.'s condition at birth,

he was identified as having special needs and provided with occupational and physical therapy. His foster parents were given training in infant stimulation and were called upon to keep a heavy schedule of clinic appointments.

... Even with considerable therapeutic intervention, [C.E.W.] continues to be developmentally delayed in most areas including speech, language and social behavior. He is impulsive and hyperactive and requires skillful parenting and discipline. He has been placed in a special education preschool program, and will continue to require comprehensive special education services.

As a basis for concluding that C.E.W.'s natural parents were unable to meet these special needs, the trial court found that his mother, an epileptic requiring frequent hospitalization for severe seizures and related chronic problems, has a history of heavy alcohol abuse; that she has at least two other children in addition to C.E.W. who are not in her care; that she visited C.E.W. only sporadically during the four and one-half years the child had been in DHS custody; and that she had been observed to engage in no spontaneous interaction during structured visits with C.E.W. The trial court found that C.E.W.'s natural father also has a history of alcohol abuse; that he has at least two other children who have been raised by other persons; that he has been unable to hold a steady job for any length of time in his adult life; and that, despite attending parenting classes in 1983, he "has shown a pronounced lack of understanding of [C.E.W.'s] limitations and needs." Although the court found that

both parents had affection for the child, it also found that the child had not "formed a bond with either natural parent." Most significantly, the court found that "[t]he testimony and demeanor of both parents at the ... hearing were such that the Court believes they are both seriously deficient in the skills and insight needed to raise [C.E. W.]."

In reviewing a trial court's termination of the parental rights of noncustodial parents, this court must determine whether the judge's finding is supported by clear and convincing evidence on the record. *In re K.A., supra*, 484 A.2d at 995; *In re M.M.M.*, 485 A.2d 180, 183 & n. 3 (D.C.1984). In the instant case, the trial court considered the relevant criteria and also found specifically that C.E.W.'s natural parents were unable to meet his special needs and that an appropriate adoptive family, capable of providing the structure, consistency, support, and understanding necessary for the child's development, would be substantially harder to find given the legal risk posed by his natural parents' residual rights. We are persuaded by our review of the record that clear and convincing evidence exists to support the trial court's finding that termination of parental rights is in the best interest of the child in question.

*Affirmed.*

ROGERS, Associate Judge, concurring:

I write separately because this case presents a fact situation which is somewhat different from prior cases which have come before this court. C.W., despite his special needs, was not only doing well in his foster home, but his natural father has maintained regular and consistent interest in him. Heretofore the record has shown merely intermittent interest by a natural parent following a child's placement in a foster home. *See, e.g., In re K.A.*, 484 A.2d 992, 995 (D.C.1984). Here, moreover, there was evidence that C.W. identified his natural father as his "father" and that his father loved C.W. Because an order terminating parental rights is so very final, the question of what C.W. has to gain from losing his "father" is not easily resolved.

A prospective adoptive home for C.W. was the occasion for the filing of the motion to terminate parental rights. That opportunity was no longer available at the time of the hearing on the motion, however. There was testimony which indicated that on two earlier occasions families had expressed some interest in adopting C.W., but their interest later subsided for reasons that are not entirely clear. There was also evidence in support of adoption over perpetuation of foster care status for C.W. Nonetheless, in my view, it would have been preferable, particularly in view of the occasion for filing the termination motion, for there to have been evidence that the legal barrier was, in fact, a reason prospective adoptive parents had ceased to remain interested in C.W. If this was not a reason for the loss of interest in C.W. by prospective parents, then the testimony from an expert in adoption placement that it would be extremely difficult to find an adoptive family willing to adopt a "special needs child *with a high legal risk*," such as C.W., is less persuasive. *See District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C. 1979) (expert testimony is only as good as the grounds on which it is based); *see also* FED.R.EVID. 703. Since the father's counsel did not challenge the expert testimony or suggest that his rights remain until such time as a prospective adoptive family was identified, the record supports the trial judge's conclusion that the expert's testimony was well founded and worthy of being credited.

I agree with the majority that clear and convincing evidence exists to support the trial judge's finding that termination of parental rights is in C.W.'s best interests. Although there was evidence of the father's affection for C.W., the father's efforts at self-improvement and his regular monthly visits with C.W., there was also evidence that the father has long had difficulty overcoming his own problems and has failed, apparently because he lacked the ability to do so, to appreciate the nature of C.W.'s limitations and needs. No claim is made that the father had been denied his

"opportunity interest" in his child. *See* Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson,* 45 OHIO ST.L.J. 313 (1984); *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Accordingly, consistent with this court's standard of review, *In re K.A., supra,* 484 A.2d at 996 ("we must satisfy the concern that there is sufficient record evidence such that the possibility of an erroneous judgment does not lie in equipoise between the two sides [but] we need not require [that] the evidence be so compelling ... as to exclude as nearly as possible the likelihood of a decision that erroneously terminates parental rights"), I join the majority in affirming the judgment.