665 A.2d 950 (1995)
In re T.M., R.M., Appellants.
No. 94-FS-862.
District of Columbia Court of Appeals.
Argued December 14, 1994.
Decided October 2, 1995.
*951 Renee S. Key, Boston, MA, for appellant R.M.
Marion E. Baurley, Washington, DC, for appellant T.M.
Charles L. Reischel, Deputy Corporation Counsel, with whom Erias A. Hyman, Acting Corporation Counsel at the time the statement was filed, and Sonia A. Bacchus, Assistant Corporation Counsel, filed a statement in lieu of brief, for the District of Columbia.
Before SCHWELB and FARRELL, Associate Judges, and MACK, Senior Judge.
PER CURIAM:
R.M., the biological mother of three-year-old T.M., appeals from an order of the trial judge terminating her parental rights. The relevant facts are set forth in the order of the trial judge which is attached to this opinion as an Appendix, and made a part hereof.
In our view, the trial judge dealt thoughtfully and responsibly with a very difficult case. He conscientiously applied the statutory standards to the record before him. The judge concluded that notwithstanding the mother's evident love for her daughter, termination of the mother's parental rights was in the child's best interest.
The judge's conclusion has ample support in the record. The evidence showed, and the judge found, inter alia, that the mother "suffers from a drug addiction which has taken a physical and mental toll upon her." The judge "credit[ed]" the mother "for recognizing her addiction and making attempts to kick her drug habit," but observed that while "she has made progress in the drug treatment programs undertaken, as often she has relapsed. Because of her addiction she has been unable to take care of T.M.'s physical, mental and emotional needs."[1] In contrast to "the birth mother's failure to recover strongly enough to offer herself as a viable parent for" the child, the judge stressed the fact that the child had lived for most of her three years with her godmother, who "is committed to caring [for] and rearing" the child, who plans to adopt her, and whom the child "treats ... as her mother." The only remaining figure in this dramatis personae was an aunt of the natural mother, with whom the child had had only minimal contact, and whom the mother recommended only as an interim custodian until she herself might one day assume custody. All told, the judge concluded that

*952 to uproot T.M. from her home and family of three years and place her with an aunt with whom she has had little contact in [the] hope that her mother will [some day] be able to care for her would be contrary to her interests in continuity of care and caretakers and [would] defeat [her] well-founded integration into the stable provident home she currently enjoys.[2]
The scope of our review of the judge's decision is limited. We may set aside his findings of fact only if they are clearly erroneous. In re L.W., 613 A.2d 350, 359 (D.C.1992). The determination whether the best interests of the child warrant termination of the mother's rights is confided to the sound discretion of the trial court. In re I.B., 631 A.2d 1225, 1230 (D.C.1993). The mother has failed to meet the exacting "clearly erroneous" standard with respect to the judge's findings, and she has not shown that the judge abused his discretion in granting the motion to terminate her rights. The reasonableness of the judge's concern about the harm that could come to the child if she were uprooted from her stable home, in favor of an at-best interim placement elsewhere, finds appellate support in our recent decision in In re L.L., 653 A.2d 873, 883-84 (D.C. 1995). In the circumstances of this case, the trial judge reasonably concluded that the pain of this unfortunate mother, genuine and severe as it appears to be, cannot be permitted to imperil the well-being of her daughter. Accordingly, and substantially for the reasons stated by the trial judge, we affirm the order on appeal.
Affirmed.[3]

APPENDIX

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

FAMILY DIVISION

In the Matter of T.M.

Docket NO. N-836-92

SOCIAL FILE 190-745

ORDER
This matter came before the court on the guardian ad litem's January 7, 1994 motion *953 for termination of parental rights, pursuant to D.C.Code § 16-2353.

I. Statement of the Case

In August of 1992, the D.C. Police arrived at the house where T.M., the respondent and R.M., her birth mother, were living in Washington, D.C., because the police had been contacted by a social worker from Virginia who claimed that R.M. had threatened to hurt T.M. Neglect charges were filed against R.M., and R.M. arranged to have T.M. placed with J.T., a family friend and T.M.'s godmother. An initial hearing was held before Commissioner Paul Buxbaum at which R.M., respondent's birth mother was apprised of the charges and assigned counsel, Robert Warner. Theresa McClendon was assigned as T.M.'s guardian ad litem. Commissioner Buxbaum ordered that R.M. be allowed supervised visitation and that she cooperate with the social worker assigned to the case. In addition, T.M. was ordered to undergo a physical exam and R.M. was ordered to undergo weekly drug testing. The case was continued for status on September 18, 1992 before the Honorable Robert S. Tignor.
On September 18, 1992, R.M. stipulated that T.M. was a neglected child pursuant to D.C.Code § 16-2301(9)(C). A disposition hearing was set for November 9, 1992 before the Honorable Noel A. Kramer. At this hearing, T.M. was placed with J.T. who eventually became her foster mother. R.M. was ordered to continue weekly drug testing and the case was continued for disposition until April 7, 1993. Following this review, counsel for both birth mother and respondent withdrew and new counsel were assigned. Virginia Stith replaced Robert Warner as counsel for the birth mother and Marion Baurley replaced Theresa McClendon as guardian ad litem.
The present matter comes before the court upon a motion to terminate parental rights pursuant to D.C.Code § 16-2353, filed by T.M.'s guardian ad litem on January 7, 1994. A hearing was held on T.M.'s motion to terminate parental rights on March 17, 18, 21, 22 and 24, 1994. Marion Baurley, Esq., guardian ad litem, appeared on behalf of T.M. Virginia Stith, Esq., attorney for T.M.'s birth mother, appeared on behalf of R.M. R.M. was present for the hearing.

II. Termination of the Parent/Child Relationship

A. Jurisdiction

This court has jurisdiction over this matter pursuant to D.C.Code Section 16-2353(a). On September 18, 1992, R.M. stipulated that T.M. was neglected pursuant to D.C.Code § 16-2301(9)(C). Judge Kramer continued the respondent's private placement with T.M.'s godmother, J.T. On January 7, 1994, T.M.'s guardian ad litem filed motion for the termination of the parent child relationship. As more than six months have lapsed between the finding of neglect and filing of motion for termination of the parent and child relationship, the motion is timely under D.C.Code § 16-2354(b).

B. Notice

Because the mother was present at the hearing, there is no issue of notice to her.

C. Findings of Fact and Conclusions of Law

The court may terminate the parent and child relationship "when the judge finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child." D.C.Code § 16-2353(a) (1989 Repl.). In determining whether it is in the best interest of the child to terminate the parent child relationship, D.C.Code § 16-2353(b) (1993 Supp.) requires consideration of several factors:

(1) The child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;

R.M. met J.T. when R.M. was staying at a shelter where J.T. volunteered on weekends. R.M. stayed at the shelter for five months following the birth of her child, T.M. during which time R.M. and J.T. became close. One afternoon while volunteering at the shelter, *954 J.T. received a phone call from R.M. asking her if she would meet her and take care of her daughter because of her inability at the time. R.M. left T.M. with J.T. and told her that she would be in touch with her.
T.M. stayed with J.T. for three months while R.M. underwent drug rehabilitation. When R.M. finished the program, she again took custody of T.M. However, after a couple of weeks, in December of 1991, R.M. called J.T. asking her to care for T.M. again. J.T. agreed, and picked T.M. up at R.M.'s aunt's house. This time, J.T. took care of the respondent for another three months. A pattern developed whereby R.M. asked and J.T. agreed to care for T.M. when she was unable because of drug abuse or efforts at rehabilitation.
Although the parties were close when the arrangement began, the relationship deteriorated as J.T. became closer to T.M. and wished to be her full time caretaker. R.M. made J.T. godmother to T.M. and turned to J.T. rather than her own family to care for her child in her absence. R.M. thought of J.T. as a mother, and believed that she would always support her efforts to overcome her drug addiction and reclaim custody of her child. Over time, however, the parties developed conflicting agendas. As J.T. became more bonded to T.M., she discontinued the liberal visitation she had once encouraged. J.T. required R.M. to arrange visits through D.H.S. rather than allowing R.M. to call her directly to see T.M. In addition, J.T. stopped allowing R.M. and her friend Y.M. take T.M. to church on Sundays. Naturally, R.M. felt betrayed when she learned of J.T.'s intention to adopt T.M. However, while R.M.'s feelings may be natural, she did little to develop a relationship with T.M. She did not arrange visitation through D.H.S. and has only seen her a handful of times since August of 1992.[1] J.T. and T.M. have now bonded to the exclusion of R.M., and T.M. treats J.T. as her mother.
T.M. has lived with J.T. at her house for most of her three years. J.T. works for the Department of Justice and provides for day care for T.M. while she is working. From the testimony and the exhibits presented, the court finds that T.M. has adjusted well to her life with J.T. and is comfortable in her home.
On the other hand, T.M. has not lived with her natural mother since she was an infant. When T.M. was in her mother's custody she lived in a number of places, including the shelter where she met J.T. T.M. also lived at her mother's friend's house on 5th Street, N.W., and briefly with her aunt and J.T. R.M. is currently incarcerated and without employment. It is unclear where R.M. will live when she is released from prison.
Over the three years, R.M. has had sporadic contact with her daughter. While sober, R.M. made great efforts to care for her child, however during periods of relapse, she has counted on J.T. to provide a home and to care for J.T. The court recognizes and commends R.M. for desiring to turn her life around. She aspires to remain sober and find gainful employment. But without current employment or an apartment, and by her present incarceration it is uncertain that she will ever be prepared to have custody of T.M. Instead, she intends for her sister, T.J. to care for T.M. until she is able to do so. The court finds that to uproot T.M. from her home and family of three years and place her with an aunt with whom she has had little contact in hope that her mother will someday be able to care for her would be contrary to her interests in continuity of care and caretakers and defeat well founded integration into the stable provident home she currently enjoys.
From all accounts, J.T. has provided a stable home environment for T.M. and the court finds that J.T. has demonstrated that she is committed to caring and rearing T.M. J.T. plans to adopt T.M. following the outcome of this trial. The court finds that termination of R.M.'s parental rights would *955 enable J.T. to move forward with adoption of T.M. and ensure permanent placement in her present stable environment.

(2) The physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child;

T.M. is a bright, happy child in excellent physical health. She has been described as friendly, caring and loving and as one who is quick to help someone in need. She has been described as a very well-adjusted child, and the court finds that all of her physical, mental and emotional needs are currently being met.
R.M. suffers from a drug addiction which has taken a physical and mental toll upon her. The court credits her for recognizing her addiction and making attempts to kick her drug habit. While she has made progress in the drug treatment programs undertaken, as often she has relapsed. Because of her addiction she has been unable to take care of T.M.'s physical, mental and emotional needs.
The court finds no evidence she will permanently overcome her addiction. Thus the evidence is against reunification.
The court has little evidence to assess the emotional, physical and psychological health of the other parties involved. J.T. and her children seem to be in good health, and no one reported any health problems.

(3) The quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including foster parent;

T.M. has had very little contact with her natural mother and extended family since T.M. went to live with J.T. Witnesses who have seen R.M. with T.M. described their relationship as loving, and it is clear from the testimony that R.M. cares for her child very much. However, it is also clear that T.M. is not bonded to her mother and natural family to the extent she is with J.T. and her foster family. T.M. has had sporadic visits with R.M. and her family over the years, and has spent some holidays with her extended family. She has met her siblings, a fourteen year old brother, who lives with his father, and a seven year old sister who lives with R.M.'s aunt.[2] She has met her aunt and great aunt, with whom she also briefly lived, and she has also met her uncles. All seem to express an interest in the welfare of the respondent.
R.M. urges the court to place T.M. with her sister T.J. who has had at most, eight visits with the respondent over the last three years, and who has only come forward and expressed interest in obtaining custody of T.M. since the petition for termination was filed. R.M.'s extended family has not been a consistent part of T.M.'s life and it is unlikely that T.M. has developed any bond with them given the scant number of visits between the parties over the years. They have not been a constant source of support and nurturance as have J.T. and her family.
T.M. has developed a strong bond and close relationship with her foster family. T.M. considers J.T. to be her mother, and calls J.T.'s husband, "Pop-pop". In addition, she is close with J.T.'s daughter, son and grandson. She also gets along well with J.T.'s great aunt. T.M. considers J.T. to be her mother, and J.T. performs all maternal functions. The court finds that T.M. would be damaged rather than helped if she were removed from her current placement.
(3A) The child was left by his or her parent, guardian, or custodian in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent, guardian or custodian of the child has not taken any action or made any effort to maintain a parental, guardianship, or custodial relationship or contact with the child;

T.M. was not left in a hospital by her parent or guardian following her birth.

(4) To the extent feasible, the child's opinion of his or her own best interests in the matter; and

*956 Because the respondent is so young, it is impossible to determine his opinion of what is best for her in this matter. The court does note that there was strong evidence presented at the hearing to indicate that she has bonded positively with J.T.

(5) Evidence that drug-related activity continues to exist in a child's home environment after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977. Evidence of continued drug-activity shall be given great weight.

While the record indicates that the birth mother has steadily used drugs, with intermittent efforts at recovery, the record contains no evidence that drug related activity existed in her home.

III. Conclusion

Both the birth mother and foster mother love T.M. very much and want what is best for the child. The court is charged with determining whether it is in the best interests of T.M. to terminate her relationship with her birth mother. Upon evaluation of the statutory factors, and in consideration of the evidence adduced at hearing on the guardian's motion, the court finds it is in T.M.'s best interest to terminate R.M.'s parental rights and allow for the respondent to be adopted by her foster mother. The court is distressed that D.H.S. did little to assist R.M. and little to pursue reunification, but this factor is inconsequential when considered next to the birth mother's failure to recover strongly enough to offer herself as a viable parent for T.M. R.M. has not had significant interaction with T.M. over the three years. T.M. is now rooted in a safe and loving household with J.T., and the court concludes by clear and convincing evidence that it is in T.M.'s best interest for the court to terminate the parent and child relationship between the respondent and her birth parent, R.M.
Accordingly, it is this 6th day of June, 1994,
ORDERED that the guardian ad litem's motion for termination of the parent child relationship is granted; and it is
FURTHER ORDERED that the parent and child relationship between the respondent's birth mother, T.M., and the respondent, R.M., is terminated; and it is
FURTHER ORDERED that R.M. is divested of all legal rights, powers, privileges, immunities duties and obligations vis-a-vis T.M. provided the right of the respondent to inherit from his birth parents shall not be terminated unless and until a final decree of adoption is entered. D.C.Code § 16-2361(a).
 /s/Stephen G. Milliken
 STEPHEN G. MILLIKEN
 JUDGE
Copies mailed to:
Ms. Marion Baurley, Esq.
514 10th Street, N.W., Ninth Floor
Washington, D.C. 20004
Ms. Virginia Stith, Esq.
215 Careybrook Lane
Oxen Hill, MD 20745
MACK, Senior Judge, dissenting:
In my opinion, the record before us does not contain clear and convincing evidence that the termination of this parent/child relationship is in the child's best interest. I would not affirm the trial court's decision. Rather, I would remand this case to permit the trial court to make more extensive, and current, factual findings consistent with the child's overall best interest.

I.
T.M. was born to appellant on March 19, 1991. Shortly after T.M.'s birth, appellant moved to a homeless shelter where she met and became friends with J.T., a weekend volunteer. Appellant stayed at the shelter for approximately six months. Soon after leaving the shelter, appellant asked J.T. to care for T.M. while she underwent drug rehabilitation. Eventually, a pattern developed where J.T. was regularly caring for T.M., because appellant, on her own initiative, frequently sought out drug-abuse treatment programs and participated in various support *957 groups.[1] Appellant made J.T. godmother to T.M. and turned to her rather than to her own family to care for T.M. in her absence.[2]
On August 3, 1992, the D.C. Police went to the house where T.M. and appellant were living in response to a call from a Virginia social worker who claimed that appellant had threatened to hurt T.M. Appellant and T.M. were escorted to a child protective agency where an assigned social worker concluded there was possible danger to T.M. and, with appellant's consent, she placed T.M. with J.T. until shelter care could be arranged.[3] The following day neglect charges were filed against appellant. On September 18, 1992, appellant stipulated that T.M. was a neglected child, pursuant to § 16-2301.[4] At the initial disposition hearing, T.M. was placed in the care of J.T., who eventually became her foster mother. On April 7, 1993, during the second disposition hearing, T.M. was committed to the legal care, custody and control of DHS. The court ordered T.M. to remain in J.T.'s custody.
On January 7, 1994, T.M.'s guardian ad litem filed a motion to terminate the parent/child relationship[5], pursuant to §§ 16-2351 et seq.[6] A hearing was held on March 17, 18, 21, 22, and 24, 1994. The witnesses at this hearing were: the two D.C. social workers assigned to appellant, T.M.'s first guardian ad litem, a pre-school teacher at T.M.'s day care center, J.T., appellant's sister and aunt, appellant, and the friend appellant was living with on August 3, 1994.
The trial court granted the guardian ad litem's motion to terminate parental rights. The court's findings of fact and conclusions of law are appended to the majority opinion. It is significant that this opinion speaks to the "bonding" that had taken place between J.T. and T.M. during this interim arrangement, and voices the court's distress that the assigned DHS social worker (who was antagonistic to appellant) had done little to affect reunification between the natural mother and child.

II.
We all can agree that the disruption of any family unit is a heart-rendering experience. However, the incidents attendant to such a disruption are necessarily unique. The court-imposed termination of the parent/child relationship is an extreme remedy that obviously has a significant lifelong impact upon all parties. Therefore, the statutory criteria, established by §§ 16-2351 et seq., should not *958 be the subject of wooden application. Relevant case law should be flexible and factspecific. We should not affirm the termination of the parent/child relationship where a less drastic remedy is both available and feasible. See In re L.L., 653 A.2d 873, 887 (D.C.1995) ("Termination of parental rights is a drastic remedy, which should be ordered only upon a showing of `clear necessity'") (citations omitted).
It is well-established in the District of Columbia that a child's best interests are presumptively served by being with his (her) natural parent(s), provided that the parent(s) is (are) not abusive or otherwise unfit. In re S.G., 581 A.2d 771, 781, 785 (D.C.1990); In re A.C., 597 A.2d 920, 925 (D.C.1991) (citing In re S.G., supra, 581 A.2d at 784-85); In re D.G., 583 A.2d 160, 164 (D.C.1990) ("In the District of Columbia, the fundamental presumption is that children and their natural parents should remain together") (citations omitted). The trial court did not expressly find appellant to be abusive or otherwise unfit.[7] In this jurisdiction, however, a showing of parental unfitness is not required in order to terminate parental rights; the dispositive factor is the best interests of the child. In re K.A., 484 A.2d 992, 997-98 (D.C.1984) (citations omitted); Shelton v. Bradley, 526 A.2d 579, 580 n. 3 (D.C.1987).[8] Nonetheless, since a child's best interests are presumptively served by being with a fit natural parent, it is clear that parental fitness, while not required, is definitely relevant to the termination of parental rights.
In granting the motion to terminate the parent/child relationship, the trial court applied the six factors established by § 16-2353(b).[9] However, it is clear that the two factors that most influenced the court's ultimate decision were the child's need for continuity of care and a stable environment, and the child's interaction with her natural family (as compared to her foster family). Although foster parent bonding may justify the termination of parental rights in order to spare the child irreparable harm, it is important to remember that not all psychological trauma is irreparable. Moreover, routine emphasis on parental bonding and continuity of care creates the significant risks of unfairly prejudicing parents who have few material resources and of institutional bias in favor of adoption by foster parents and against reunification with natural parents. The New Jersey Supreme Court recently addressed these concerns:
The evidence presented by DYFS [Division of Youth and Family Services] did not support or sustain a conclusion that moving children under those circumstances will, to a reasonable psychological certainty, *959 cause serious harm, [especially given the expert testimony to the contrary] ... The standard is not that the end result cause no pain or trauma but that the child be kept from its parents only to avoid serious and lasting harm.
We noted in [case name omitted] that risks inhere in the use of bonding and psychological-parental theories. The theories are abused if routinely relied on to keep children in foster care rather than return them to their parents.... The facile use of the bonding theory can increase the risk of institutional bias militating in the direction of permanent placement and adoption of children in foster care .... In a process in which stability and continuity are made paramount, such subtle prejudices may unfairly weigh the process against parents with fewer material resources.
We are compelled to note that much of the bonding that has taken place in this case could have been avoided if the the agency had correctly followed its mandate to use due diligence and its best efforts to reunite children with their natural parents .... By encouraging her foster parents to believe that K.L.F. was on the way to becoming their child ... DYFS may have [improperly] increased the amount of bonding that has occurred.
In re K.L.F., 129 N.J. 32, 608 A.2d 1327, 1333-34 (1992) (citations omitted).[10]
The trial court in the instant case not only found that DHS was non-responsive to appellant's requests for visitation and public assistance, but (as we have noted) also found that the main social worker assigned to the case was "antagonistic" to appellant and "did little to affect reunification." See majority op. at 954 & n. 1 (Appendix). Although the trial court therefore declined to credit DHS's testimony, it concluded, nonetheless, that DHS' actions towards appellant were "inconsequential" because of appellant's "failure to recover strongly enough to offer herself as a viable parent." See majority op. at 956 (Appendix). However, on this record, there is ample evidence to conclude that both social workers' indifference and hostility towards appellant were indeed consequential. In short, the actions or inactions of DHS prevented a mother, with few material resources who was anxious to reunify with her daughter and willing to take the necessary steps for reunification, from achieving this goal. The trial court failed to adequately consider DHS's improper contribution to appellant's already difficult situation. Although DHS, unlike DYFS (discussed in the K.L.F. case, supra), has no statutory mandate to take affirmative steps to reunify a parent and child, this court has held that DHS does have specific obligations in the reunification process. See, e.g., In re A.C., supra, 597 A.2d at 924 & n. 6; In re D.R.M., 570 A.2d 796, 808 (D.C.1990).
In In re A.C., supra, we discussed at length the roles of the court and public agencies (particularly DHS) in the reunification process:
The controlling statute in this jurisdiction contains no requirement that DHS make affirmative efforts to reunite the family. That is not to suggest that the custodial governmental agency has no obligation in that regard .... Following an adjudication of neglect, a predisposition study and report must be prepared which addresses the harms which led to intervention, plans for alleviating them, recommended services and service providers, actions required by the parents to remedy problems, estimated time necessary to reach goals of intervention, and the criteria for determining that continued intervention *960 is no longer necessary. If the child is removed from the care of a parent . . . the report must contain plans for maintaining contact between parent and child and for fostering that relationship, consistent with the child's well-being.

* * * * * * *
The action or inaction of the agency having custody of the child is pertinent to the determination of whether a parent has seized that opportunity interest ....
The agency's action [or inaction] is relevant to other factors as well [including "the child's need for continuity of care and for timely integration into a permanent home"]. . . . Evidence that the agency failed to [provide "meaningful intervention" "in the lives of the existing family"]. . . may explain the parent's prior inability to meet the child's needs, and leave open the prospect that the child's integration into a permanent home might be better achieved by increased services, rather than by termination of parental rights.

597 A.2d at 924-26 (citations omitted; emphasis added).[11] Similarly, in In re D.R.M., supra, we expressed concern about the potential for institutional bias favoring termination of the natural parent/child relationship over reunification:
Read literally, this testimony [of a DHS supervisory social worker] would mean that, in DHS's view, when the natural parent has established no relationship with the child for a year following birth, a virtual conclusive presumption arises in favor of adoption, and not very much the parent can do will dissuade DHS from that course .... [P]rospective reunion with the child would, in practice, be a fiction. DHS also, having elected for adoption, would have little incentive to assist the natural parent in designing and following through on a case plan looking toward reunification....
We are convinced, however, that although a danger arises of institutional ambivalence (not to say schizophrenia) regarding reunification . . . the record in this case does not demonstrate that the agency's interest in or efforts toward reuniting child with mother slackened after D.R.M. was placed in a potential adoptive home.
Id., 570 A.2d at 807-08.[12]
According to the social worker's testimony in the instant litigation, appellant's case plan required her to: (1) undergo drug treatment; (2) look for housing accommodations; and (3) search for employment.[13] Both appellant and the social worker testified that they had a difficult time contacting each other and as a result, they only met twice from 1992 to 1993. Both parties also agreed that the clash of personalities prevented any type of meaningful, productive relationship to develop.[14] Again as we have noted: the social worker was "antagonistic" towards appellant, "did little to affect reunification," and his "case *961 plan was narrow."[15] Not only was reunification not adequately addressed, but, it can be inferred from the social worker's testimony, that the employment requirement was never discussed in detail because he thought the first two objectives were more important.[16] The social worker also testified that he never referred appellant to receive drug treatment, even though appellant's participation in a drug treatment program was a key prerequisite to reunification.[17] Moreover, there was nothing in the case plan addressing appellant's obvious need for assistance in locating housingnor was she ever given any assistance in this endeavor.[18]
Most importantly, the case plan did not specify any arrangements for appellant to visit with her child. The social worker simply told appellant to contact him whenever she wanted to visit with T.M. However, according to appellant, she attempted on numerous occasions to contact the social worker to schedule visits, to no avail. Given our discussion in A.C. of DHS's statutory duty to make plans for maintaining contact between the parent and child, the absence of any specific arrangements for appellant to visit with T.M. is particularly disturbing.[19] At the very least, the case plan should have contained provisions allowing for supervised visitation of T.M. by appellant.[20]

III.
Unlike the parents in In re A.C. and In re D.R.M., appellant's actions did not reflect an indifference towards or a lack of interest in making the lifestyle changes necessary for her to be permanently reunited with her child. To the contrary, appellant's actions indicate that she was anxious to reunify with her child and that she was willing to take the steps necessary to achieve this goal. Moreover, it is clear that appellant was a loving mother with few material and human resources who was doing what she thought was best for her child. It is also clear that DHS failed to provide appellant with the necessary guidance and resources for her to realistically *962 "recover strongly enough to offer herself as a viable parent." Although DHS does not have an affirmative duty to reunify a parent and child, it does have statutory obligations which it failed to comply with in the instant case. Considering that appellant clearly had few resources, and the obvious need for discouraging bias in favor of adoption by foster parents and against reunification with natural parents, DHS' contribution to appellant's failure to provide a stable home environment and failure to develop a bonding relationship with T.M. is very relevant and should have been given more weight by the trial court in its analysis.
In sum, the record before us does not contain clear and convincing evidence that termination of the parent-child relationship is in T.M.'s best interest. First and foremost, the trial court (and appellees) heavily rely upon the uncertainty surrounding appellant's future ability to continue her drug treatment, find housing, and obtain employment created by her incarceration. See majority op. at 954 (Appendix). In this regard, it was revealed during oral argument that appellant is no longer incarcerated. Thus, the written record before us does not reflect this important intervening change in appellant's life. Second, given the presumption that a child's best interests are served by being with a natural parent who is not unfit, the record in this case does not adequately address the mother's ability (or lack there of) to care for T.M.[21] Furthermore, the record lacks any evidence concerning the potential psychological impact on T.M. if she is returned to her mother's custody.[22] And finally, measures less extreme than the termination of the parent/child relationshipsuch as supervised visitation by appellantwere not attempted or even discussed. Therefore, I would vacate the judgment and remand the case in order for the trial court to make more extensive and current findings addressing the concerns expressed herein.
Accordingly, I respectfully dissent.[23]
NOTES
[1] At the time of the hearing on the motion to terminate her parental rights, the mother was incarcerated pending sentencing for what she called "drug trafficking," and for willful failure to appear in court. It was for these reasons that she asked that her daughter be placed with the child's aunt.
[2] This case is wholly unlike In re T.J., 666 A.2d 1 (D.C.1995), in which the court has held that "a parent's choice of a fit custodian for the child must be given weighty consideration which can be overcome only by a showing by clear and convincing evidence, that the custodial arrangement and preservation of the parent-child relationship is clearly contrary to the child's best interest." Id., at 16. To be sure, there is superficial similarity between the cases in that, in each of them, the mother asked that the child be placed with an aunt (in T.J. a great-aunt). In T.J., however, the child had spent some twenty-five weekends with the great-aunt, and had "interact[ed] warmly with the individuals in [that] home, especially his sister" who was in the great-aunt's custody. Moreover, in T.J., the mother sought to designate the great-aunt as the child's permanent or at least long-term custodian (the mother conceding her inability to care for the child). In the present case, by contrast, the mother envisages the aunt as only an interim caregiver. Finally, in this case, as distinguished from T.J., no issue was ever raised as to the standard of proof by which the mother's choice of custodian is evaluated against the overarching criterion of the child's best interest.
[3] Pointing to the judge's finding that the social worker from the Department of Human Services did not carry out his responsibilities in a satisfactory manner, see note 1 to the judge's order, infra, at 954, the mother argues that "a parent's parental rights should not be stripped from [her] where services provided by DHS prove to be inadequate." We share the judge's concern about the performance of the agency, but that consideration cannot be dispositive. We recently reiterated in In re L.L., supra, that the overriding consideration is the best interest of the child and that parental rights must sometimes be terminated regardless of the defaults of public agencies. 653 A.2d at 882. "[T]he child cannot be punished for the alleged wrongs of the bureaucracy." Id. (quoting L.W., supra, 613 A.2d at 355 n. 11).

The mother also contends that "[t]he lower court, in terminating the mother's parental rights, acted prematurely." We recently discussed in some detail the pitfalls of the "wait and see" option where, as the trial judge found here, there is no early prospect that the mother will be able to care for her child. L.L., supra, 653 A.2d at 887-89; see also In re S.C.M., 653 A.2d 398, 406 (D.C.1995) ("[p]rotracted retention in temporary foster care is generally not in a child's interest"). This is especially true where, as here, a court considering reunification with the mother would have to consider, for many years, "the kind of risk that is involved in putting a child of [tender years] in the environment that drug addiction breeds." L.L., supra, 653 A.2d at 885 n. 25 (quoting In the Interest of Ashley K., 212 Ill.App.3d 849, 156 Ill.Dec. 925, 571 N.E.2d 905, 922 (1991)).
[1] The court does not fault R.M. solely for the failure to arrange visitation since D.H.S. and particularly R.M.'s social worker, E.B., were not responsive to her requests for visitation and public assistance. From the beginning of the case, E.B. was antagonistic to R.M. and did little to affect reunification. His contact with her was sporadic and inconsistent and his case plan was narrow. The court finds that D.H.S.'s efforts at reunification were wanting and thus the court declines to credit E.B.'s testimony.
[2] It is noteworthy that R.M. has not raised any of her children.
[1] Although appellant's participation in a drug treatment program was an explicit prerequisite to her reunification with her daughter, DHS never referred appellant to a program nor provided her with any assistance in obtaining drug treatment. See infra at 960-961. Appellant sought out drug treatment on her own.
[2] Placement of T.M. with blood relatives was not pursued because it was against appellant's wishes. The record does reflect that at least one blood relative, a maternal aunt, did express an interest in taking custody of T.M. from the onset. However, given that appellant's relatives apparently offered her no assistance in her time of needin terms of her homelessness and her drug abuse(the record is noticeably silent on this issue), appellant's actions in discouraging placement of T.M. with blood relatives was arguably in T.M.'s best interest.
[3] Under D.C.Code § 6-2102 (1995), DHS social workers are required to launch an investigation within 24 hours (or immediately, in an abuse or dangerous situation) of receipt of a neglect allegation prior to making a decision tantamount to removing a child from his or her home. See D.C.Code § 6-2105 (1995). The social worker in this case, however, concluded that T.M. was in possible danger on the same day as the allegation after briefly interviewing appellant, J.T., and the police officers. Appellant's "consent" to place her child with J.T. after the decision to remove her child had been made does not absolve the social worker from her statutory obligation to launch an investigation prior to making such a decision. I note that, apart from the call to the police claiming a purported threat, there was no evidence of injury nor of prior abuse or neglect from which the DHS social worker could conclude that T.M. was in any kind of danger. Rather, it would appear that the social worker in this case failed to comply with her statutory obligation. However, because appellant stipulated to the neglect adjudication, this issue is not properly before this court.
[4] D.C.Code § 16-2301(9)(C) (1989).
[5] In a recent decision, In re P.D. & D.D., 664 A.2d 337 (D.C.1995) (Mack, J.), I have expressed in a separate statement concerns about our court-approved practice of permitting a guardian ad litem to set in motion a TPR proceeding.
[6] D.C.Code §§ 16-2351 et seq. (1989).
[7] In fact, none of the evidence presented revealed a history of abuse; nor did it reveal that T.M. was not receiving the necessary and proper care from her natural mother prior to the petitioning of the neglect case.
[8] Note, however, that we have also held that a showing of parental unfitness is required in child custody cases. Id. ("If unfitness need not be proved even in a termination-of-parental rights case, then it seems illogical to require such proof when only the custody of a child is being decided"); Appeal of H.R., 581 A.2d 1141, 1153 (D.C. 1990) (comparing the "fitness test" to the "best interests" test), cert. denied, ___ U.S. ___, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994); id. at 1153 n. 12.
[9] D.C.Code § 16-2353(b) (1989 & 1995 Supp.) provides in part:

(b) In determining whether it is in the child's best interests that the parent and child relationship be terminated, a judge shall consider each of the following factors:
(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages;
(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;
(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative and/or caretakers, including the foster parent;
(3A) the child was left by his or her parent, guardian, or custodian in a hospital ... [T.M. was not left in a hospital];
(4) to the extent feasible, the child's opinion of his or her own best interests in the matter; and
(5) evidence that drug-related activity continues to exist in a child's home environment... [the record contains no evidence that drug related activity existed in T.M.'s home; see majority op. at 955-956 (Appendix)].
[10] Like appellant, the mother in that case was homeless and unemployed at the time she gave birth to her child; however, unlike appellant, she had no history of drug abuse. Unable to find shelter for herself and her daughter, the mother entered into a temporary custody agreement with DYFS and consented to the temporary placement of her daughter in foster care. She tried on numerous occasions to talk with a social worker about her child. Caseworkers sent letters to various state agencies and made phone calls in an effort to locate her. Upon finally reaching her child's social worker, approximately nineteen months after the child had been placed in foster care, the mother was informed that the agency had placed her child with pre-adoptive foster parents, legal action was being brought against her, and that she would not be allowed to visit her child absent a court order. Id. at 1328.
[11] In contrast to appellant, the parent in In re A.C. had no interaction with his child for at least four years (with the exception of one hospital visit), failed to appear for a visit with his child that he requested, was unable to be located by social workers on numerous occasions (DHS had contacted shelters, hospitals, jails, etc.), and even failed to attend the hearing terminating his rights (in spite of having been personally served and notified). Furthermore, unlike the current situation, it appears that the parent in In re A.C. made no efforts on his own to contact his child or to contact DHS (even though DHS gave him the necessary information at the neglect hearing).
[12] In contrast to the current situation, reunification efforts were actively pursued by DHS in the D.R.M. caseincluding referring the mother to counseling and parenting classes (which she failed to attend). Id. at 798-801. In fact, it is clear that it was the natural mother's disinterest in creating a case plan, her failure to even attempt to comply with the case plan and her overall failure to cooperate with the social worker (i.e., numerous missed appointments) that prevented her from having any realistic chance of reunifying with her child. Id.
[13] During cross-examination, the social worker admitted that he had never read the report prepared by the initial social worker concerning the neglect adjudication; that he had never seen this report; and that he did not have a copy of it on file. Thus, it appears that the social worker constructed a case plan without first reviewing vital background information.
[14] According to appellant, her attorney requested that another social worker be assigned to the case; however, this request was never acted upon.
[15] See majority op. at 954 & n. 1 (Appendix). Given that "the first goal of DHS is to achieve family reunification", the apparent absence of any substantive plan for reunification (as illustrated by the case plan itself and the discussions between appellant and the social worker) is troublesome, to say the least. In re A.C., supra, 597 A.2d at 924 n. 6; In re D.R.M., supra, 570 A.2d at 808.
[16] Consider the following portion of the examination:

Q. And were these the criteria for her to regain custody of her child?
A. I would say the first two are very important.... [I]t's not as if everybody can get a job, but if there was a way that she couldshe wanted job training or anything. I could have referred her. So that'sit's a broad thing that webut that's not the big criteria.
Q. So if she underwent drug treatment and then looked for accommodations, they were the key things for her regaining custody of her child?
A. Yes.
[Emphasis added.]
[17] THE COURT: But did you refer [appellant] for drug treatment?

THE WITNESS: I did not refer her because she didn't want to. She told me she didn't want to.
THE COURT: As to the whyhave you treated addicts who are so sick that they need help even though they don't ask for it?
THE WITNESS: You are asking me if someone has to be referred against her will.
THE COURT: I'm asking you about when you said the word voluntary [earlier in the testimony]. In your mind, is an addict freely able to stop using drugs whenever the addict chooses?
THE WITNESS: No. No, it's not possible. It's not easy for an addict to
THE COURT: Next question.
[18] Furthermore, according to appellant's testimony, she asked the social worker for assistance in obtaining medicaid and food stamps. Although he referred her to the food stamp office, when appellant asked the social worker for bus tokens, he told her he had none.
[19] See supra at 959-960 (discussion of the A.C. case).
[20] In fact, the case plan taken as a whole was clearly inadequate in that it failed to comport with the statutory requirements that we discussed at length in A.C. The plan did not discuss how appellant was going to alleviate the harms that led to the intervention. As a related issue, the plan also failed to recommend services and service providers to appellant. Moreover, the plan did not contain any estimated time frames in which appellant was to achieve the required objectives.
[21] Given the existence of fully functional drug addicts, simply stating that appellant is unable to adequately care for her child because she is a drug addict, see majority op. at 954-955 (Appendix), is not enough. Furthermore, the court's finding of "no evidence [appellant] will permanently overcome her addiction" id., is arguably premature, because "relapse" is often viewed as part of the recovery process. There was no expert testimony or other medical evidence presented on this issue. Compare to In re L.L., supra, 653 A.2d at 882 (where two uncontested experts unequivocally testified that father's mental health history made him unfit parent); id. at 878-79.
[22] "The standard is not that the end result cause no pain or trauma but that the child be kept from its parents only to avoid serious or lasting harm." In re K.L.F., supra, 608 A.2d at 1333 (emphasis added); see supra at 958-959. There was also no expert testimony or other medical evidence presented on this issue. Compare to L.L., supra, 653 A.2d at 882 (expert testified that separation of child from foster mother would create substantial risk of regression and longterm harm to child); id. at 878-79.
[23] In re L.L., supra, heavily relied upon by the majority, is distinguishable in important respects. See, e.g., notes 21 & 22, supra. In that case, the father whose parental rights were at issue had been convicted of sexually molesting his young stepdaughter and had an extensive history of life-endangering psychological problems, including suicide attempts, threats to family members and others, and admitted homicidal feelingsall of which represented a significant risk of physical and/or emotional harm to any child left in his care. Id., 653 A.2d at 878. Moreover, although the court reiterated that "`the child cannot be punished for the alleged wrongs of the bureaucracy,'" id. at 882 (citation omitted), it recognized that dereliction on the part of the agency is a relevant factor "where, with a little more effort by the agency, reunification could be safely and promptly accomplished." Id. at n. 17.