In re A.S.C., S.L., Appellant.

In re A.S.C., A.C., Appellant.

District of Columbia Court of Appeals.

Argued Nov. 22, 1994.
Decided Feb. 29, 1996.

Charles A. Moran, Montclair, NJ, appointed by the court, for appellant S.L.

Marion E. Baurley, Washington, DC, appointed by the court, for appellant A.C.

Leslie J. Susskind, appointed by the court, for appellee.

Vanessa Ruiz, Acting Corporation Counsel at the time the brief was filed, with whom Charles L. Reischel, Deputy Corporation Counsel, and Rosalyn Calbert Groce, Assistant Corporation Counsel, filed a memorandum in lieu of brief for the District of Columbia.

Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.

WAGNER, Chief Judge:

This is an appeal from an order of the trial court terminating parental rights under the provisions of D.C.Code §§ 16–2353, –2365 (1989–1995 Supp.). Prior to the termination hearing, appellee, A.S.C., had been adjudicated to be a neglected child within the meaning of D.C.Code § 16–2301(9)(A) and (B) (1989), and she had been committed to the care of the Department of Human Services (DHS) on September 4, 1990. Appellants, A.C. (the father) and S.E.L. (the mother), A.S.C.'s natural parents, argue that the trial court's decision is not supported by clear and convincing evidence. Both parents contend, *inter alia,* that the evidence failed to show that termination would achieve the statutory purposes where there was no evidence of parental unfitness and no reasonable prospects for the child's adoption. Although the case is a close one, we conclude that termination of parental rights was premature. Accordingly, we reverse.

### I.

A.S.C. was born on April 5, 1989 in the District of Columbia at Howard University Hospital to S.E.L. and A.C., who have resided together for some seventeen years.[1] At birth, the mother was addicted to heroin, and the child was born with serious medical problems, including low birth weight and heart and digestive problems. Because of her condition, the child had to be fed through a stomach tube and required the administration of oxygen. A.S.C. was not medically ready for discharge from the hospital when her mother was, and the mother left without her and moved to Brooklyn, New York to join the father.

On February 26, 1990, pursuant to D.C.Code § 16–2301(A), (B), and (F), the District of Columbia (District) filed a petition alleging that the child had been abandoned and that she was without proper parental care. That same day, the trial court ordered the child's placement in shelter care in the custody of DHS, with supervised visitation rights reserved to the parents. Following a trial on the neglect petition, the court (Judge Mencher) entered an order adjudicating that A.S.C. was a neglected child within the meaning of D.C.Code § 16–2301(9)(A) and (B) in that she was abandoned by her mother and father and she was without proper parental care which was not due to the parents' lack of financial means. Specifically, the court determined that the mother and father had failed to provide medical consent promptly and to make reasonable efforts to visit and care for the child.[2] Following the disposition hearing, the trial court committed the child to the custody of DHS and ordered DHS to seek placement for her at the Hospital for Sick Children (HSC). A.S.C. remained at HSC continuously up to the time of the hearing on the motion to terminate parental rights.

1. The trial court made no finding concerning whether the parents have a valid common-law marriage.

2. The trial court's conclusions were based upon its factual findings that in September, 1989, a social worker at the hospital, Diedra Wright, telephoned the child's parents and informed them that the child needed surgery. The parents refused to consent by telephone, and after a follow-up letter from the social worker, the mother responded that she would contact the hospital when she returned to the District. The mother returned in November, but she did not contact or visit the hospital until December, 1989 when she finally consented to the surgery. The social worker told the mother that she should visit the child at least two times per week, but she visited only once. In December, 1989, S.E.L. gave the social worker two addresses at which she could be reached in the District, but the social worker found a vacant lot at one, and no one answered the door at the other.

On October 31, 1990, the child's attorney filed on her behalf a motion to terminate parental rights under the provisions of D.C.Code § 16–2354 (1989). Pursuant to court order, both parents were served with notice of the proceeding by certified mail at their last known address and by posting of a notice in the Neglect Clerk's Office of the Superior Court for a period of two weeks. DHS sent bus tickets to the mother and father for their transportation from New York to the District for the hearing. S.E.L. represented to the court that the father, who was represented by counsel at the hearing, had to remain in New York City to care for the couple's eleven-year-old daughter.[3]

At the termination of the parental rights hearing (TPR), Toni Peterson, a pediatric social worker at Howard University Hospital, testified that A.S.C. was transferred to her unit at the hospital in December, 1989 and that because of little or no involvement by her parents, the only discharge plan made was for the child's transfer to HSC when she was medically ready. Ms. Peterson, while substituting for another social worker, spoke with the mother by telephone in New York only once, but had no other contact with her. However, she testified that she was informed that A.S.C.'s parents visited the child on January 8, 1990.

Pamela W. Saunders, a clinical social worker at HSC, testified that she was assigned to care for A.S.C. after the child was transferred there in February, 1990. She stated that upon admission, A.S.C., who was then a year old, was medically fragile and oxygen dependent, and she had a feeding tube in her stomach and a tracheotomy tube to facilitate her breathing. According to Ms. Saunders, the child's condition had improved to the point that she was able to take a little food by mouth. She described A.S.C. as "an ador-able little girl" to whom "people are usually attracted." She testified that senior citizen volunteers visit and assist with the care of the child. In addition, three other volunteers, Andrea Hunter, Phyllis Randle and Fran Lowell, visit regularly with her. Lowell had completed parent training and had taken A.S.C. out of the hospital.

Saunders testified that when she returned from leave, she was briefed on the case by another social worker who informed her that the mother had visited the child twice in June, 1991 and also on the day before the hearing. Ms. Saunders further testified that A.S.C. was medically ready for discharge from HSC provided they can locate a suitable home with someone who receives proper training for the child's care.[4] She testified that the mother had commenced the requisite training the day before the hearing with the occupational, recreational, speech and hearing therapists, and the nurses and that S.E.L. had viewed a film about CPR. She further testified that, based on her observations, there was nothing to prevent the mother from caring for the child if she continued the training and had day and overnight visits with the child. Saunders also testified that she had been talking at least twice a week to a social worker at the shelter where the mother and father reside in connection with arranging for them to come to the District.

Phyllis Randle, who was assigned A.S.C.'s case in September, 1989 while employed at DHS, testified that the child's parents had expressed their desire to have custody of the child, but they lived in New York and had financial problems. Ms. Randle arranged to send the mother a bus ticket at that time, but the mother did not come to the District until December, 1989 where she remained for a couple of weeks before seeing Ms. Randle.

---

**3.** The mother testified that she attempted unsuccessfully to secure transportation or child care for her daughter through a social worker in New York, Mrs. Cabrerra. Mrs. Cabrerra contacted the social workers in the District who sent tickets only for the mother and father, and they did not provide child care arrangements. The mother also testified that the shelter in which they live has strict rules that children may not be left alone.

**4.** Ms. Saunders explained that the parent would have to meet with various specialists, including nurses, respiratory, occupational, speech and hearing therapists, and a nutritionist. The person assuming the child's care would have to be trained to perform CPR, to feed her and administer an aerosol medication, which the child requires every six hours. The parents are required to have a one-day and an overnight visit with the child, a home visit, and a discharge meeting with the treatment team.

The mother told Ms. Randle that she had eight other children, only two of whom lived with her in New York. The mother admitted to drug use at that time, but Ms. Randle had no knowledge of such usage after June 6, 1991. Ms. Randle stated that the mother had contacted her many times prior to December, 1989 and had always indicated that she wanted the child to be returned to her. The mother gave Ms. Randle her telephone number, and agreed to Ms. Randle's request for a home visit, but the mother did not contact the worker further about it.

Ms. Randle testified that she had visited the child twice prior to January and almost every week thereafter. She reported that since July or August, the child had grown rapidly, improved health-wise, and had commenced to talk, walk and recognize people. Ms. Randle said that she did not know that the mother's permanent home was in New York, and that she never attempted to do a home study at the New York address which the mother provided. She testified that an arrangement for transfer of the child to New York would have been appropriate if the child been ready for discharge from the hospital, which she was not.

Sevara Cruzat, a social worker with the Intensive Services Branch of DHS since August, 1991, testified that neither parent had contacted her since she had the case. She testified that she had been in contact with the social worker in New York City to arrange for bus tickets to be given to the mother and father.

Andrea S. Hunter, a volunteer at Howard University Hospital, testified that she had been visiting the child from 1989 until November, 1991 and had taken a course in CPR in preparation for visits with the child outside of the hospital. She testified that she had not taken the remaining training because she was seeing other children and had to care for her own child. Ms. Hunter said that she was not in a position to become a foster parent or to adopt the child because of her own family circumstances.

Frances E. Lowell, formerly a recreational therapist at HSC, took the training to take A.S.C. out for day passes and had done so for four visits. She testified that caring for the child was very complicated initially, but became easier with experience.[5] Ms. Lowell said that she told the social workers that she was unable to consider adoption because she was not married, worked full-time at a new job, and had just moved out of her parents' home.

The mother testified that she lives in Brooklyn, New York with the father and their two children, ages seven and eleven. The four of them live in a family shelter where they occupy a two-bedroom apartment, with a living room, dining room, kitchen, and bath. The mother admitted that she had a drug problem when A.S.C. was born and that she was not then mentally or physically able to care for the child. She testified that she had visited the child about six times over the past two and one-half years, had met with Ms. Randle on several occasions, and knew the addresses and phone numbers of Ms. Randle and DHS. She testified that she was in a methadone maintenance program in New York six days a week and was not using any other drugs.

## II.

A trial court may terminate parental rights when it " 'finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child.' " *In re M.M.M.*, 485 A.2d 180, 183 (D.C.1984) (quoting D.C.Code § 16–2353(a)). "This finding must be based on 'clear and convincing evidence.' " *Id.* (quoting D.C.Code § 16–2359(f) (1989)). "[T]he burden is on the moving party to show that the termination of [parental] rights would be in the best interests of the child." *In re A.B.E.*, 564 A.2d 751, 755 (D.C.1989) (citing *In re K.A.*, 484 A.2d 992, 995–96 (D.C.1984)); *M.M.M.*, 485 A.2d at 183. The TPR statute requires the trial court to consider the following principal factors in determining whether the child's

5. Ms. Lowell testified that when she takes the child home, the child requires special equipment: a five-foot oxygen tank, a portable oxygen tank, a feeding pump, medications, and miscellaneous baby items.

best interests would be served by terminating the parent-child relationship: (1) the need of the child for continuity of care and for timely integration into a permanent home; (2) the physical, mental and emotional health of all involved as it affects the welfare of the child; (3) the quality of the relationship and interaction of the child with the parents, other relatives or caretakers; (4) the child's opinion of his or her best interest when feasible; (5) evidence of continued drug activity in the home after intervention and services have been provided pursuant to section 106(a) of the Prevention of Child Abuse and Neglect Act of 1977, effective September 23, 1977 (D.C.Law 2–22; D.C.Code §§ 6–2101 *et seq.*); and (6) failure of the parent to take action to contact the child or maintain the parental relationship after leaving the child in the hospital for at least ten calendar days following birth in spite of the child being medically ready for discharge. D.C.Code § 16–2353.

 In reviewing the trial court's decision, this court must determine whether it is supported by clear and convincing evidence in the record. *In re A.C.*, 597 A.2d 920, 926 (D.C.1991); *K.A., supra,* 484 A.2d at 996. In order to affirm the decision, "this court must be satisfied that there is sufficient evidence 'such that the possibility of an erroneous judgment does not lie in equipoise between the two sides.'" *A.C., supra,* 597 A.2d at 926 (quoting *K.A.,* 484 A.2d at 996). We will reverse the trial court's determination of where the best interest of the child lies only for an abuse of discretion. *Id.; In re A.M.,* 589 A.2d 1252, 1257 (D.C.1991). That standard requires this court to assure that the trial court has exercised its discretion within the range of permissible alternatives, having considered all relevant factors and no improper ones, and then to determine whether its decision is supported by "substantial reasoning" based upon a factual foundation in the record. *A.M.,* 589 A.2d at 1257–58 (quoting *In re D.R.M.,* 570 A.2d 796, 803 (D.C. 1990)). Applying that standard of review, we conclude that the trial court's evaluation of

the evidence against the relevant factors did not support, by clear and convincing evidence, the conclusion that termination of the parental rights of the mother and father was in the child's best interest, at least at this time.

### III.

In concluding that termination of parental rights was in the child's best interest, the trial court considered the relevant factors enumerated in D.C.Code § 16–2353.[6] We examine each of the court's findings and conclusions with respect to these factors as they bear upon the issues raised.

A. *Continuity of Care and Timely Integration Into a Permanent Home*

 In considering this first factor, the trial court determined that the child could not receive continuity and stability from her parents because of her medical condition and the parents' social and economic circumstances. Specifically, the trial court recounted that the parents are unemployed, live in a homeless shelter, and have a history of illegal drug use. The court observed that the mother has eight additional children, two of whom live with her, and therefore projected that the child's needs would "place an even greater strain on an already overburdened family unit." The court was also of the view that the child was in a stable environment at HSC and that future planning for her foster care or adoption would assure her stability.

 The mother provided the only evidence concerning the family's home environment in New York. The government did not obtain a home study. According to the mother's testimony, she and the father, who had a seventeen-year relationship, had stopped using drugs at least since April, 1991, and both were in a methadone maintenance program. Although they were unemployed and lived with their two children in a family shelter, their home consisted of a living room, dining room, two bedrooms, and bath. Social workers were involved in assist-

---

6. Because of the child's age, one statutory factor, the child's opinion of her own best interest, is not a pertinent consideration, and therefore, the trial

court did not consider it. *See* D.C.Code § 16–2353(B)(4).

ing them in New York. The mother had inquired and expected the social workers' assistance if the child were placed with them. Based on these facts, we question the trial court's apparent conclusion that it had been clearly and convincingly demonstrated that the family will be unable, within a reasonable time, to provide continuity and stability, especially where, as here, the only readily available alternative is continued institutional care.[7]

In considering the first criterion, the trial court also observed that S.E.L. had "presented no evidence of a comprehensive plan to insure that [the child] would receive continuity and stability of care, caretakers, and home environment." The father argues that the burden is upon the moving party in a TPR proceeding, and therefore, the child's parents are not required to present such a plan at the hearing in order to defeat the motion. The moving party has the burden of proving by clear and convincing evidence that termination of parental rights is in the child's best interests. *A.B.E., supra,* 564 A.2d at 755. The father's position seems to be that, in light of the evidence presented by the moving party, the parents had no obligation to offer evidence to refute any claim of the movant that the parents could not provide continuity of care and stability for the child. On review, our concern is with whether "there is sufficient record evidence such that the possibility of an erroneous judgment does not lie in equipoise between the two sides." *K.A., supra,* 484 A.2d at 996. We can dis-

pose of the case with that as our focus, rather than focusing upon whether there was sufficient evidence to require appellants to offer evidence to meet it. Examining the record in that light, the evidence relevant to the first criterion does not weigh clearly and convincingly in favor of termination of parental rights.

There was no evidence to refute the mother's testimony as to her long-term relationship with the father, the parents' care for the children who resided with them, the parents' involvement with social services workers in New York, the adequacy of their living quarters, and their willingness, with some assistance, to assume the care of the child.[8] While there was evidence that the parents had substance abuse problems in the past, the trial court found as fact that both the mother and father were in a drug treatment program. The evidence showed that the mother had started the training necessary to assume the child's care and that there were no impediments to her caring for the child if she completed the training. While this gesture might be viewed as too little, too late under some circumstances, weighed with the other evidence, including that the child remains confined to a hospital with no foreseeable prospects for an adoptive or foster home placement, it cannot be said that the child's need for continuity of care will be better served by termination of parental rights. The trial court found specifically that the child had no prospects for adoption in the near future and that she "may fall within the

---

7. The mother also contends that, in considering the child's needs for continuity of care, the trial court improperly factored in the parents' lack of financial resources. It may be that the trial court intended its discussion of these circumstances to relate only to the question of the parents' ability to accommodate the child's special needs. The parents' poverty, in and of itself, would not be an appropriate ground for determining that the child's best interests would be served by termination of parental rights. It is not a factor included in the criteria set forth in the TPR statute. *See* D.C.Code § 16–2353. Our neglect statute explicitly excepts as a basis for a finding of parental neglect a lack of care, control and subsistence for a child which is due to the parent's lack of financial means. *See* D.C.Code § 16–2301(9)(B). There can be little doubt that the forced severance of the parent-child relationship because of the parents' impecuniousness would offend fundamental constitutional princi-

ples. *See Santosky v. Kramer,* 455 U.S. 745, 760 n. 10, 102 S.Ct. 1388, 1398 n. 10, 71 L.Ed.2d 599 (1982) (absent showing of unfitness, it is not clear that State constitutionally may terminate parental rights). "Parents are not to be adjudged unfit because they lack resources or intelligence, but only by reason of conduct detrimental to the physical or mental health of the child." *New Jersey Div. of Youth and Family Servs. v. A.W.,* 103 N.J. 591, 512 A.2d 438, 451 (1986). If, as the mother contends, the trial court took into account the parents' lack of financial resources, as such, in assessing the child's need for stability, this factor would not provide support for its ruling. Parents may not be deprived of the right to rear their children on account of the parents' poverty.

8. The government did not conduct a home study.

low end of the adoptability scale." Therefore, there appears to be no substantial good to be achieved for the child by termination of parental rights at a time when the parents have been in drug treatment for some time, have a home, have availed themselves of social services in their home state, have started the special training needed for the child's care, and have expressed their desire to have their child with them. *See A.B.E., supra,* 564 A.2d at 757. The termination of parental rights would not assure continuity or stability of care for the child. Rather, it would place her in a situation in which she no longer has a mother and a father, with no early prospect for adoption.

B. *The Physical, Mental, and Emotional Health of All Involved as it Affects the Child's Welfare*

█ The trial court concluded that if the child's health is to be improved and maintained, she must have custodians with special training in the areas of speech, nutrition, feeding, and CPR as provided by the team at HSC. The court concluded that the mother's failure to complete the training and to arrange for a home study demonstrates the parents' lack of concern for the child's health and welfare. The court also stated that the parents' long history of illegal drug use "does not establish evidence supportive of strong physical, mental, and emotional health."

The evidence did show that neither parent had completed training with HSC. However, as the court found, the mother began the course the day before the hearing. There was evidence that the mother expressed her intention to complete the training and that there appeared to be no reason she could not complete it successfully. On the other hand, there was evidence that the parents were not able to afford to travel to the District for the training and that they received their drug treatment in New York City where they lived, facts not rejected by the court. The evidence showed that the parent's opportunity for visits and training were impeded by their financial circumstances and obligations to their other children. Yet, DHS appears to

have taken no steps to assist the parents in securing any of the necessary training in New York City. There was evidence that an interstate compact was available to have the child transferred to New York where her parents resided and that social workers and the staff at Howard University Hospital had discussed that possibility.[9] There was also evidence that a home study of the parents' home in New York could have been undertaken pursuant to an interstate compact but was not.

█ This court has held that "the effort to reintegrate the family is a relevant factor in the decision-making process in a proceeding to terminate parental rights." *A.C., supra,* 597 A.2d at 925. Thus, "the action or inaction of the agency having custody of the child is pertinent." *Id.* "Evidence that the agency failed to make prior efforts ... may explain the parent's prior inability to meet the child's needs, and leave open the prospect that the child's integration into a permanent home might be better achieved by increased services, rather than by termination of parental rights." *Id.* (citations omitted). This is especially true, where, as here, there is little prospect that termination will be followed by the child's prompt adoption or integration into a secure and stable home. In its careful and detailed ruling, the trial court apparently did not consider the impact of the failure of DHS to explore reintegrating the family through the interstate compact, which seems particularly compelling in this case, given the special circumstances of the parents and the special needs of the child. Whether the parents are unable to care for their child should be considered in the context of whether effective services to the parents would enable them to provide for the child's physical, mental and emotional needs. In this case, "[t]he child's chance for realizing a permanent home may be improved significantly, not by terminating parental rights in hopes of an adoptive placement, but by meaningful intervention of the social service agency in the lives of the existing family." *Id.*[10]

9. *See* D.C.Code §§ 32–1041, –1043 (1993) which provides for the interstate placement of children.

10. But *cf. In re L.L.,* 653 A.2d 873, 882 (D.C. 1995) ("the child cannot be punished for the

C. *The Child's Interaction and Relationship with Parents and Others*

 The trial court's finding that A.S.C. had only six visits with the child, and therefore enjoyed no relationship with her other than a biological one is supported by the evidence. The trial court concluded that "[t]o sever the parental relationship would not eliminate any emotional or psychological ties between daughter and mother because it is doubtful, under the circumstances, that such ties exist." The record supports the court's conclusion that the child had developed no relationship with the parents. However, the record fails to disclose the quality of any relationship and bonding that the child, who has been hospitalized since birth, has had with any others. This is also a significant factor in the analysis of this criterion. Unfortunately, this child had no other relationships with family, and she has not been placed in a foster home. How consideration of these facts influenced the court's view of this factor, we cannot discern from the record. The lack of bonding between parents and child is significant, but cannot support termination where, so far as the record reflects, there has been no bonding with any prospective substitute parent.

D. *Abandonment of Child, Medically Ready for Discharge, at a D.C. Hospital and Failure to Make Effort to Maintain Contact With Child*

The trial court found that the parents did not violate the precise letter of the law as set forth in D.C.Code § 16–2353(b)(3A) because the child was not ready for discharge at the time that they left.[11] However, the court found that the parents violated the spirit of the law because they failed to maintain contact with the child and the hospital. The child was only medically ready to leave HSC a short time before the termination hearing. Despite the infrequency of the parents' visits, there was evidence that both parents visited the child and talked about her to hospital staff and DHS social workers and that they consistently expressed their interest in having custody of the child.

E. *Evidence of Drug–Related Activity In Child's Home Environment After Provision of Intervention and Services*

 Although there was no evidence of current drug-related activity in the parents' home, the trial court weighed this factor heavily against them because of their prior history of drug abuse. The statute deals explicitly with "evidence that drug-related activity continues to exist in a child's home environment *after intervention and services have been provided.*" D.C.Code § 16–2353(b)(5) (emphasis added). That provision further states that "[e]vidence of continued drug-activity shall be given great weight." *Id.* S.E.L. testified that both she and her husband entered a methadone treatment program in April, eight months prior to the hearing. She testified that she had not been "faithful" to other treatment programs in the past, but that she was being faithful to the one she was currently using.[12] She also testified that to her knowledge, the father was also no longer using drugs. The trial court credited the mother's testimony on the subject, and there was no evidence that drug-related activity continued to exist in the parents' home.[13]

**IV.**

 In evaluating the trial court's conclusion that termination of parental rights was in the child's best interest, we consider the three purposes for which the statute

---

alleged wrongs of the bureaucracy") (quoting *In re L.W.*, 613 A.2d 350, 355 n. 11 (D.C.1992)).

**11.** D.C.Code § 16–2353(b)(3A) provides that the court consider the following in determining whether to terminate parental rights:
the child was left by his or her parent ... in a hospital located in the District of Columbia for at least 10 calendar days following the birth of the child, despite a medical determination that the child was ready for discharge from the hospital, and the parent ... has not taken any action or made any effort to maintain a paren-

tal, guardianship, or custodial relationship or contact with the child. . . .

**12.** A court-ordered drug test of S.E.L. taken on the day of the hearing was negative for drug use.

**13.** Aside from § 16–2353(b)(5), the court is not precluded from considering a parent's history of drug abuse and the possible risk to the child's welfare that it might present in some cases. *See L.L., supra* note 10, 653 A.2d at 885 n. 25.

providing for the termination of parental rights was enacted: (1) to encourage stability in the life of the neglected child; (2) to ensure the recognition and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for prompt adoptive placement. *A.B.E., supra,* 564 A.2d at 756 (citing D.C.Code § 16–2351(a)). In this case, the trial court found that there were no foreseeable adoption prospects for the child and that she fell "low on the scale of adoptability." Under the circumstances, termination of the parents' parental rights will increase only slightly the child's chances for adoption. When this minimal opportunity is balanced against preserving "the sense of identity, that some continuing legal relationship with the natural relatives may ultimately bring," *id.,* we are not persuaded that the drastic step of termination of parental rights may be found to be supportable under our standard of review.[14] The circumstances might be quite different if the child's prospects for adoption were greater or a prospective placement had been shown.[15] Whether the hospital offered a greater potential for bringing stability into the child's life than the parents' efforts would provide, if supported by meaningful assistance from social services, has not been shown by clear and convincing evidence on this record. At most, "the possibility of an erroneous judgment [lies] in equipoise between the two sides." *K.A., supra,* 484 A.2d at 996.

Accordingly, we reverse the decision of the trial court terminating the parental rights of S.E.L. and A.C. and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

**14.** "Termination of parental rights is a drastic remedy, which should be ordered only upon a showing of 'clear necessity.'" *L.L., supra* note 10, 653 A.2d at 887 (quoting *In re William L.,* 477 Pa. 322, 383 A.2d 1228, 1241, *cert. denied,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978)). On review, this court must consider whether the trial court has exercised the appropriate restraint before granting TPR petitions. *Id.*

**15.** Our disposition does not preclude the later filing of a TPR motion if there is a material change in circumstances affecting the child's best interests which warrants it. In the interim, the child remains committed to the custody of DHS until further order of the court, and any reunification efforts of the parents with the child are subject to review of the court. *See* D.C.Code § 16–2323(b)(1)–(4) (1989).