*So ordered.*[10]

**In re: C.M.; S.S., Appellant.**

**Nos. 05–FS–1529, 06–FS–157.**

District of Columbia Court of Appeals.

Argued Oct. 24, 2006.

Decided Feb. 1, 2007.

---

---

Jennifer V. Hancock, appointed by the court, for appellant S.S.

Stacy L. Anderson, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Assistant Attorney General, were on the brief, for the District of Columbia.

David A. Wanger, Guardian ad Litem, filed a statement in lieu of brief.

Jon S. Pascale filed a statement in lieu of brief for appellee F.M. Sr.

Before RUIZ and KRAMER, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

Appellant S.S. (hereinafter "the mother"), the mother of C.M. (hereinafter "the child"), challenges the termination of her parental rights of C.M.[1] She asserts that the trial court abused its discretion in finding that the termination order was in the best interest of the child because the trial court did not adequately consider the present suitability of the child for adoption. In addition, the mother contends that the trial court erred in concluding that there was sufficient evidence in the record to support the termination order in light of the three statutory purposes of the termination of parental rights statute.[2] We affirm.

## I.

### A.

The child, born on October 13, 1992, is the biological child of the mother and F.M. Sr.[3] The child lived with his biological parents in the District of Columbia until June 21, 2005, at which time he was removed from their care after being examined at Children's Hospital and found to have a second-degree burn, approximately two to three days old, on his forehead. The injury occurred while he was in the custody and care of his mother. The child was returned home after neglect petitions were filed. He was adjudicated a neglected child pursuant to D.C.Code § 16–2301(9)(A) (2001) as a result of a stipulation signed by the mother on November 20, 1995. In this stipulation, the mother admitted that the child suffered a burn while in her care, and that the explanation

---

1. It has been brought to this court's attention that Judge Kaye K. Christian's order of November 15, 2005 erroneously labeled Jennifer Hancock, Esquire as Counsel for Adoptive Parents. The order should have read that Jennifer Hancock is Counsel for Biological Mother. The misstatement is hereby deemed corrected, pursuant to D.C.App. R. 16(b) (2006).

2. The mother raises a question as to the waiver of her consent to the adoption of the child's brother, F.M. The contention has no relevance to the procedural posture of this case. Accordingly, we do not address it further.

3. The trial court granted the government's motion to terminate the parental rights of F.M. Sr., with respect to the child. F.M. Sr. did not appeal the order. We only examine the trial court's order with respect to the mother.

she gave for the burn was not supported by the medical evidence.

The child was in the care of his mother and father from June 1995 until August 1995, at which time the mother moved to Georgia, where she has remained continuously since she left the District of Columbia. The child remained in the care of his father from August 1995 until May 1997. The child moved several times during that two-year period, as F.M. Sr. struggled to maintain steady employment and a stable residence.[4] On June 3, 1997, F.M. Sr. contacted the probation officer assigned to his case and asked that the child and his younger brother, F.M., be removed from his care as he was homeless, unemployed, and unable adequately to care for his children. From June to August 1997, the child lived with the mother in Georgia, but was removed from her home following an allegation that her boyfriend excessively disciplined him.[5] The child was committed to the custody of Child and Family Services Agency in the District of Columbia ("Agency") in July 1998, and lived with an aunt until the Fall of 1998. The Agency's placement recommendation regarding the child's permanency was changed from reunification to adoption in 2000. Since leaving his aunt's home, the child has lived in two foster homes, and since October 2002, has resided in institutional settings. He lived at Devereux Children's Center ("Devereux") in the District of Columbia from February 24, 2003 to July 20, 2005. He currently resides at the Barry Robinson Center in Norfolk, Virginia. He has not lived with his mother since August 1997.[6]

B.

The District of Columbia filed a Motion for Termination of the Parent Child Relationship between the child and the mother pursuant to D.C.Code § 16–2354(a) on June 29, 2004. An evidentiary hearing pursuant to this motion was held before Magistrate Judge McCabe on August 8, 12, 15, and 16, 2005.[7]

At the evidentiary hearing, witnesses were called on behalf of the government, M.C. (the foster parent of F.M., petitioning to adopt F.M.), and the mother. Jo–Ella Brooks, of the Family Treatment Court, testified that she was familiar with the child and the mother through her employment. She testified that when the mother moved to Georgia in August 1995, the mother understood that relocation was not in the best interest of the child.[8] Ms.

---

**4.** The child originally lived with the father, F.M. Sr., in an apartment in Washington, D.C. that was held under the mother's name, but was forced to move when she stopped paying rent. For a period of time, the child was homeless.

**5.** Such punishment was contrary to a court order. When asked during an evidentiary hearing about the circumstances surrounding these allegations, the mother testified that she was not certain what happened during that time period, in part because she was pregnant at the time.

**6.** The mother paid child support for the child from 1998 to 2002, during which period money was deducted from her paycheck and for-

warded to Virginia, where the aunt of the child was living. Since 2002, the she has not paid child support, but has periodically purchased gifts and clothing for him.

**7.** Simultaneously, Magistrate Judge McCabe held a show cause hearing pursuant to D.C.Code § 16–304(e) with regard to the petition of M.C. to adopt F.M., the child's brother and the mother's son. The mother is only appealing the decision relating to the child C.M.

**8.** Ms. Brooks testified that relocation to Georgia would not be in the best interest of the child because such a move by the mother would be traumatic to him. Ms. Brooks also testified that the mother moving would leave

Brooks further testified as to the contact maintained between the mother and the child.[9]

The government called Carlos Astrada, a psychiatrist at Devereux Children's Center, as an expert witness in the field of child psychiatry. Dr. Astrada has known the child since he was first admitted to Devereux on February 24, 2003. Dr. Astrada testified that the child is very troubled, with mild mental retardation, Attention Deficit Hyperactivity Disorder ("ADHD"), and also suffers from Psychotic Disorder Not Otherwise Specified (NOS) that sometimes manifests itself in auditory hallucinations. In the expert opinion of Dr. Astrada, the child is very hyperactive, impulsive, aggressive, and sometimes acts out in a sexually inappropriate manner. Dr. Astrada further testified that although the child made some progress during his time at Devereux, he requires more residential treatment at this time, and is not a candidate for adoption immediately. However, it was anticipated that he would be available for adoption following additional treatment of at least one year.[10] The record does not reveal his present status, a year plus some months after the August 2005 hearing.

The government called Carrelle Tiller, Clinical Coordinator at Devereux, as an expert in social work, specifically in counseling children with emotional problems. Ms. Tiller was assigned to the child as his therapist when he was first admitted to Devereux on February 24, 2003. Ms. Tiller testified that the mother called the child between one and three times per month, and visited him seven times during the two and a half years he lived at Devereux. The child acted as though he were happy to see his mother during the early visits, but was very disrespectful to her during later visits. Ms. Tiller also testified that the child is very limited in making emotional attachments with anybody, including his parents. Ms. Tiller stated that when she asked the child whether he would like a family, he replied yes, even one different from his biological family.

The government called Brian Michael Carr, a social worker for the Agency, as an expert in the field of social work, specifically in finding adoptive homes for children in the neglect system. Mr. Carr worked as the child's adoption recruitment social worker. Mr. Carr testified that the Agency received inquiries from five families about adoption of the child following his presentation on the "Wednesday's Child" program on television.[11] He further testified that two of the five families were aware that the child may have mental or other maladies,[12] yet have begun the pro-

the child in the care of F.M. Sr., a possible alcoholic who was unable to maintain a permanent home.

**9.** Ms. Brooks testified that the mother maintained contact with the child infrequently. The mother called on a monthly basis, but never visited.

**10.** Dr. Astrada testified that the child's limited cognitive ability would affect the ability of any parent to be able to provide care and management to him. As such, no family would be able to provide what he needs right now. At present, integration of the child into a family setting is a long-term goal.

**11.** "Wednesday's Child" is a television program in which the Agency highlights children—predominately from the District of Columbia area—that are available for adoption. The program is shown on Wednesday, Thursday, and Sunday mornings.

**12.** Mr. Carr testified that when families see the Agency's children on the "Wednesday's Child" program, they know that the children have some special needs. However, the two prospective families have not been provided with full information regarding the child's specific mental handicaps and emotional behavior problems because of confidentiality rules. While a child's mental handicaps,

cess of being licensed as adoptive parents.[13] Mr. Carr stated that he was "very optimistic" about finding an adoptive placement for the child, as he has found adoptive homes for many other troubled children,[14] and the child has expressed an interest in being placed with a family. Mr. Carr testified that the prospects of finding an adoptive home will increase if parental rights are terminated.

The mother testified that she moved to Georgia in August 1995 because of an employment promotion. She stated that her relocation was also the result of physical and verbal abuse she suffered while living with F.M. Sr. When she moved to Georgia, she did not request that the child move with her, and she was aware that her children would not be able to move with her unless her new home was approved by social workers in Georgia through the Interstate Compact for the Placement of Children. She acknowledged that she was told during court hearings in the neglect case in 1998 that in order to be seriously considered for reunification with her children, she must move back to the District of Columbia area; however, she did not return to the city. She testified that she visits the child approximately four times a year, coinciding with major holidays.[15] She occasionally visits the District of Columbia without visiting him. She complet-

ed parenting classes on discipline, but has not taken classes specifically designed for parents of children with special needs. Although the mother testified that she would do whatever is necessary to get her children back, she stated that she has no current plans to return to the District of Columbia—and is reluctant to move back—because of financial limitations and the fact that she has made a stable home in Georgia for herself and her youngest son. She owns a private home in Georgia, and has a full-time job with the United States Department of Health and Human Services. She also attends college part-time.

Magistrate Judge McCabe issued the Finding of Fact, Conclusions of Law, and Order Waiving Consent of the Biological Parents to the Adoption of F.M. and Order Terminating Parental Rights of Parents of C.M. on August 24, 2005. On September 22, 2005, the mother filed a Motion for Review of Order Terminating Her Parental Rights of C.M. The reviewing court issued an order on November 15, 2005 denying the mother's motion. The reviewing court found that the trial court did not abuse its discretion in finding that it was in the child's best interest to terminate the mother's parental rights in order to increase the child's chance of being adopted, even though he was not ready for adoption

---

emotional, and behavioral problems are barriers to adoption, Mr. Carr stated that these were not insurmountable barriers and are often overcome.

**13.** According to Mr. Carr, it takes prospective couples three to four months to be approved as adoptive parents. Mr. Carr testified that the child's transition into an adoptive home must be gradual. The Agency would have the adoptive family go to the child's institutional residence and meet with his therapist, as well as other experts. The family would complete any additional training that was necessary to make the transition successful.

**14.** Mr. Carr has been able to place in adoptive homes children who have had emotional problems requiring residential treatment. Mr. Carr testified that of the fifty to sixty children that he has recruited for adoption, he has found adoptive placements for about twenty-five children. Of those twenty-five children, approximately sixteen have had problems or maladies similar to those of the child.

**15.** The mother stated that she doesn't feel limited by the court in how often she visits the child, just by how often she can travel to the District of Columbia.

at the time of the hearing. Further, the reviewing court found that there is clear and convincing evidence in the record supporting a conclusion that termination of the mother's parental rights was warranted in light of the three statutory purposes of the parental rights termination statute. This appeal followed.

## II.

The mother contends that the trial court's decision to terminate her parental rights of the child was an abuse of discretion. Specifically, she argues that the trial court abused its discretion in finding that it was in the child's best interest to terminate her parental rights. The mother also asserts that the record does not support a conclusion that termination of her parental rights is warranted in light of the three statutory purposes of the parental rights termination statute.

## A.

 The termination of parental rights is a "drastic remedy," and may be ordered only upon a showing of "clear necessity." *In re A.S.C.*, 671 A.2d 942, 951 n. 14 (D.C.1996) (internal quotations omitted). A trial court may terminate a parent-child relationship when it determines, on the basis of the evidence presented and after due consideration of the interests of all parties, that the termination is in the best interest of the child. D.C.Code § 16–2353(a). This determination is made by weighing the statutory factors that must be considered by the trial court in termination of parental rights proceedings under D.C.Code § 16–2353(b). There are four statutory factors for the trial court to consider: (1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences in the development and the concept of time of children of different ages; (2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child; (3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relative, and/or caretakers, including the foster parent; and (4) to the extent feasible, the child's opinion of his or her own best interest in the matter.[16] *Id.* § 16–2353(b). A trial court's decision to terminate parental rights must be supported by clear and convincing evidence, and may be reversed only for an abuse of discretion. *In re Antj.P.*, 812 A.2d 965, 969 (D.C.2002). A standard of clear and convincing evidence "lies somewhere between a preponderance of evidence and evidence [convincing] beyond a reasonable doubt." *In re K.A.*, 484 A.2d 992, 995 (D.C.1984). This court must be satisfied that "the possibility of an erroneous judgment does not lie in equipoise between the two sides...." *Id.* at 996.

 The mother asserts that the trial court's evaluation of the evidence against the relevant factors did not support, by clear and convincing evidence, the conclusion that the termination of the mother's parental rights was in the child's best interest. We, along with Judge Christian, are satisfied that the magistrate judge, who properly considered all of the statutory factors, could find, by clear and convincing evidence, that termination of the parent-child relationship between the mother

---

16. We have omitted the references addressing abandonment of a child at a hospital after its birth and evidence of drug-related activity in the child's home, because they do not apply in this case. *See id.* § 16–2353(b)(3A), (b)(5).

and the child is in the best interest of the child. We examine each factor in turn.

In evaluating the child's need for continuity of care, the court found that the child has not lived with his mother for eight years, ever since she moved from the District of Columbia to Georgia without him. The court also found that, despite speaking to the child on the telephone about once a week, the mother has had very limited in-person contact with him over the past ten years. The mother testified that she was told, by the Honorable Russell Canan, on many occasions between 1998 and 2002, that she would have to return to the District of Columbia area to be seriously considered for reunification with the child. From the testimony and evidence presented at the hearing, the court concluded that the mother has not demonstrated any real commitment or interest in being reunited with the child.[17]

Based on the court's finding that, at the time of the hearing, the child required more residential treatment, the mother argues on appeal that termination of her parental rights would not achieve stability and continuity for the child because he was not an immediate candidate for adoption. The court found that the termination of the mother's parental rights of the child will help him achieve stability and continuity because it will increase his substantial chance of being adopted, since potential adopters will not be dissuaded by the possibility that the mother will contest an adoption proceeding.[18] Further, the court noted that it is anticipated that the child will be available for adoption after he completes his treatment, and that the Agency was optimistic about his prospects for being adopted. *Cf. In re A.S.C.*, 671 A.2d 942, 951 (D.C.1996) (reversing termination of parental rights when termination would increase "only slightly" the child's chance of being adopted, but noting that "circumstances might be quite different if the child's prospects for adoption were greater or a prospective placement had been shown").

The court also considered the physical, mental and emotional health of all of the parties involved in this case. It found that the child is very troubled, and has resided in institutional placements for almost three years. Although the court found that there was no evidence that the mother suffers from any physical, mental, or emotional problems, the court determined that through her actions over the past ten years, she has demonstrated that she is not interested in caring for the child.

17. On appeal, the mother claims that the court disregarded credible evidence concerning her desire to reunify with her son. She testified that she misses her son greatly, that she has been looking into mentoring, therapy, and tutoring programs in Georgia, that she has a home with adequate bedroom space, and that she has identified services she is interested in receiving, such as intensive family counseling and parenting courses, in the event she is permitted to be reunified with him. However, the court concluded that testimony that the mother misses the child is not sufficient to show that she is willing and capable of providing continuous care for him; in fact, from testimony it is apparent that we can presume that the judge concluded that the mother failed to follow through on her ex-

pressed willingness to improve her parent/child relationship.

18. The mother's argument on appeal that termination of parental rights is premature when a child is not immediately suitable for adoption misinterprets the purpose and text of the statute at issue: if a child is found to be neglected, a court has jurisdiction to "[t]erminate the parent and child relationship for the purpose of *seeking* an adoptive placement for the child...." D.C.Code § 16–2320(a)(6) (emphasis added). This court has held that parental rights may be terminated even in the absence of a prospective adoptive placement. *In re C.T.*, 724 A.2d 590, 598 (D.C.1999).

In evaluating how the child's emotional and behavioral troubles will affect his candidacy for adoption, the court considered the testimony of Dr. Astrada, who opined that the child would be suitable for adoption following further residential treatment of at least one year. The court credited Dr. Astrada's testimony regarding his diagnosis of the child's mental and emotional disorders, but did not discuss his testimony in its order as to matters arguably not within his field of expertise, namely, adoption. As such, the trial court did not improperly disregard Dr. Astrada's expert testimony.

■ This court has held that "the effort ... to reintegrate the family is a relevant factor in the decision-making process in a proceeding to terminate parental rights." *In re A.C.,* 597 A.2d 920, 926 (D.C.1991). However, failure of the custodial agency in its responsibility to make efforts to reunify the family does not necessarily preclude the termination of parental rights. *Id.* The court noted that the Agency made some efforts to help reunify the family.[19] While the extent of those efforts were not discussed in depth, the court found the record tends to show that if there was a lack of pursuit of reunification, the mother was equally to blame.[20]

The trial court also considered the quality of interaction and interrelationships between the child and the mother. The trial court found that the child does not have a close relationship with the mother, she has not cared for him on a day-to-day basis in the past eight years, and has only sporadically seen him in that period of time. The child has no other relationships with family, and has not been placed in a foster home. This court has noted that the lack of a close relationship between a parent and child "cannot support termination where ... there has been no bonding with any prospective substitute parent." *In re A.S.C., supra,* 671 A.2d at 950. The record shows that the child has moved from one residential institution to another during his childhood. On the facts of this case, there could not possibly have been any bonding with a "prospective substitute parent."

In evaluating the child's desires, the trial court observed that because the child is currently in a residential placement and has cognitive limitations, he has not been asked directly for his views on adoption, although he has expressed an interest in living with a family. Despite the child's limitations, the court found that his desire to live with a family is a factor worthy of consideration. The court concluded that the child was more likely to reach that goal via adoption than reunification, and that his desire to live with a family improves his chances of adoption.

We hold that there was sufficient evidence to support the trial court's conclusions regarding D.C.Code § 16–2353(b)(1)–(4). The child has not lived with his mother for eight years, ever since she moved from the District of Columbia to Georgia

---

**19.** The judge detailed these efforts in his order. The child was returned to the mother for a brief period of time in 1997 most likely due to the work of the Agency, and then removed following allegations of abuse imposed by the mother's boyfriend. Although the mother argues on appeal that the Agency failed to provide services to her once the goal had changed from reunification to adoption, the child "cannot be punished for the alleged wrongs of the bureaucracy" when adoption is clearly in his best interest. *See In re L.W.,* 613 A.2d 350, 355 n. 11 (D.C.1992).

**20.** Although the mother maintains on appeal that the hearing record demonstrates her desire to reunite with the child permanently, the record also reflects infrequent visitation by the mother and her failure to develop or maintain a parent/child bond.

without him. When the child was returned to the mother, he was removed from her custody after a brief period of time, following allegations of abuse imposed upon him by her boyfriend. The mother has had very limited in-person contact with the child over the past ten years.

B.

■ In evaluating the trial court's conclusion that termination of parental rights was in the child's best interest, we consider the three purposes for which the statute providing for the termination of parental rights was enacted: (1) to encourage stability in the life of the neglected child; (2) to ensure the recognition and enforcement of the constitutional rights of all parties; and (3) to increase the opportunities for prompt adoptive placement. D.C.Code § 16–2351(a)(1)–(3); *In re A.S.C., supra,* 671 A.2d at 950–51. These statutory purposes do not trump the four statutory factors we considered in D.C.Code § 16–2351(b); merely, this court considers whether any of the three enumerated purposes offer an "answer for the purpose of determining whether the termination of parental rights is warranted." *In re*

A.B.E., 564 A.2d 751, 756, 756 n. 4 (D.C. 1989).

■ On appeal, the mother argues that the court's termination of her parental rights of the child does nothing to enhance his stability. She further argues that the due process rights of the parent are intertwined with the best interest of the child, and there is no evidence to support that the child's best interest will be served by the termination. She also contends that the termination does not enhance his prospects for prompt adoptive placement, as he is not presently suitable for adoption. These contentions are not persuasive on this record.

The court considered how termination of parental rights of the child would encourage stability in his life. It found that upon completion of his treatment program, the child will have a substantial chance of being adopted and that this chance would be increased by the termination of the mother's parental rights. Despite the mother's argument that the child is not presently suited for adoption because he requires more residential treatment,[21] the court concluded that adoption, in this case, was a

21. In support of her argument, the mother compares the present case to *In re A.B.E., supra,* in which this court held that the statutory purpose regarding stability in the life of the child was not significant in determining whether termination of parental rights was warranted, since the trial court found that none of the alternatives to termination of parental rights offered any promise of stability in A.B.E.'s life. *In re A.B.E., supra,* 564 A.2d at 756. However, the case before us is distinguishable. While the trial court found A.B.E. to have no reasonable opportunity for adoption, *id.* at 757, the trial court in this case found that future adoption was a realistic and viable alternative following termination of parental rights for the child.

The mother attempts to distinguish from the present case two cases that the court used in order to support its decision to terminate her parental rights of the child: *In re JaJ.,*

814 A.2d 923, 925–26 (D.C.2002), and *In re Tw.P.,* 756 A.2d 402 (D.C.2000). The mother argues that these two cases are distinguishable from the case at issue because in each case, in which an order for termination of parental rights was upheld, the child was "psychologically ready for adoption." *In re Tw.P., supra,* 756 A.2d at 407; *see In re JaJ., supra,* 814 A.2d at 925. However, the child's emotional and behavioral problems are not an insurmountable obstacle to his adoption; indeed, as stated, the court in this case found that future adoption was a realistic and viable alternative following the termination of parental rights of the child. Accordingly, the mother's argument is unpersuasive on this record, where it is apparent that without termination of parental rights, adoption chances would be reduced. The trial court's finding is not clearly erroneous and was supported by Dr. Astrada's and Mr. Carr's testimonies.

realistic and viable alternative following termination of parental rights.

 The court next considered how termination of parental rights of the child would ensure the recognition and enforcement of the constitutional rights of the mother and the child. The Supreme Court has recognized that natural parents have a "fundamental liberty interest ... in the care, custody, and management of their children" which is protected by the Fourteenth Amendment's Due Process Clause. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Natural parents do not lose this constitutionally-protected right "simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* However, this right is not absolute and must yield to the child's "best interest and well-being," which is the overriding concern. *In re Antj.P., supra,* 812 A.2d at 970 (quoting *In re K.I.,* 735 A.2d 448, 454 (D.C.1999)). In determining the child's best interest, the trial court considered the relevant factors enumerated in D.C.Code § 16–2353(b). It found by clear and convincing evidence that termination of the mother's parental rights of the child was in his best interest. This court holds that the trial court did not abuse its discretion in terminating the mother's parental rights of the child. Further, this court holds that the trial court afforded recognition to the constitutional rights of the mother, but her rights "must give way before the child's best interests." *See In re A.B.E., supra,* 564 A.2d at 755. As such, its order terminating the parental rights of the mother did not conflict with the statutory purpose of D.C.Code § 16–2351(a)(2).

 Lastly, the court considered how termination of the parental rights of the mother would increase the opportunities for the child's prompt adoptive placement. As both the trial court noted in this case, and this court noted in *In re A.B.E., supra,* 564 A.2d at 754, termination of parental rights increases a child's opportunities for adoptive placement. While in *A.B.E.* the trial court found that the child had a marginal chance of adoptive placement because of his developmental handicaps, the court in this case concluded that the child had a realistic possibility of future adoptive placement. The court credited the testimony of Mr. Carr, an adoption recruiter, who testified that he has had substantial success placing children with problems similar to the child with adoptive parents. The court found that five families have expressed interest in adopting the child, and two families have already begun the process of becoming licensed adoptive parents. While it is true that the child was not ready to go home with an adoptive family at the time of decision, and the identification of potential adoptive families was still at the preliminary stages, the court found that he should be ready for adoption when he completes his residential treatment program. This court holds that termination of the mother's parental rights upholds the statutory purpose of increasing the opportunities for prompt adoptive placement.

Therefore, there is clear and convincing evidence in the record supporting a conclusion that termination of the mother's parental rights was warranted in light of the three statutory purposes of the parental rights termination statute, as detailed in D.C.Code § 16–2351(a)(1)–(3). The record reveals no reversible error in terminating the mother's parental rights of the child.

Accordingly, the judgment is

*Affirmed.*

RUIZ, Associate Judge, concurring:

This is an unusual and difficult case because it involves consideration of the

dual challenges of parenting a child who is in an institutional setting because of significant special needs and of securing permanent placement for such a child in an adoptive home. I join the majority in affirming the trial court's determination that it is in the best interests of C.M. to terminate his mother's parental rights based on the findings of the magistrate judge, supported by clear and convincing evidence in the record, that the mother had only sporadic visits with the child over a number of years and thus did not have a meaningful parent-child relationship with him,[1] and the opportunity for improving the child's prospects for adoption.

I write separately to address the mother's argument, not specifically referred to in the majority opinion, that she is being "punished" for moving out of the District. Her argument is based on the implication of repeated comments in the record that her relocation to Georgia and her failure to move back to the District of Columbia could, without more, properly be considered in the trial court's calculus as weighing against the mother's expressed desire and ability to be a parent to her child. There are references to the mother's return to the District as a required "first step" towards reunification with her child,

and her failure to do so was emphasized by the reviewing trial court.[2] The comments seem unfair and unwise on the facts of this case, where the mother left her home in the District of Columbia to escape an abusive situation and, since relocating to Georgia, has led a stable, productive life: she had another child, works for the federal government, is studying for a college degree and lives in a home where she would like to raise C.M. A parent's move away from an unhealthy relationship and noxious influences to begin a new life elsewhere may well be the best thing a parent can do for a child, as a parent's well-being—emotional, physical, mental—is recognized in our statute as a necessary foundation for successful parenting. *See* D.C.Code § 16–2353(b)(2) (2001) (indicating that "the physical, mental and emotional health of all individuals involved" is a factor to be taken into account in deciding whether to terminate parental rights). Moreover, in the case of C.M., *where* the mother resided was not as important as in the usual situation—so long as she was able to maintain and nurture a relationship with her child—because the child's health and special needs required that he live away from home in an institutional setting.[3] The insistence that the mother re-

---

1. Nonetheless, the mother maintained weekly telephone contact with her child.

2. The magistrate judge mentioned in his findings of fact that the mother had been "told [by another judge] on many occasions ... that she would have to return to the D.C. area to be seriously considered for reunification" with her child, and that the mother "acknowledge[d] that it would be much easier for her to see the [child] if she lived in the Washington, D.C. area." Separate from these admonitions, the magistrate judge determined that the mother had not demonstrated great interest in reunifying with her child, grounded as a factual matter on the mother's sporadic visits. On review of the magistrate judge's decision, the trial court returned to the theme of the mother's relocation to Georgia, stating that

"among the most compelling" evidence of the mother's inability or unwillingness to parent C.M. was her failure to "return to the District of Columbia after being admonished ... on several occasions, that her return was a prerequisite of her reunification" with C.M. We are bound—as was the reviewing Superior Court judge—by the factual findings of the magistrate judge. Therefore, I see no basis for the mother's argument that her parental rights were terminated as punishment for her failure to comply with the various admonitions that she should return to the District of Columbia.

3. There was another child in the case who was not in an institution and who was the subject of an adoption petition. The mother

turn to the District appears not to have focused on the reasons for the mother's move and her subsequent progress, but driven by concern about limits on the District's jurisdiction and the ability to provide services if the child were to reside with his mother in another state.[4] Although such a transition will require planning and possibly overlapping authority, given interstate agreements and the reality of our mobile society, they are issues to be faced and addressed with care by the relevant social services agencies, not additional roadblocks to be erected in the path of families already under stress. *See* D.C.Code § 34–1421, –1423 (2001) (providing for the interstate placement of children); *In re A.S.C.*, 671 A.2d 942, 949–50 (D.C.1996) (reversing termination of parental rights, noting with disapproval that government had not assisted parents in securing necessary services in New York, where they resided, and there were no reasonable prospects for adoption of hospitalized child).

My disagreement with these comments notwithstanding, I join in affirming the trial court's decision to terminate appellant's parental rights based on the magistrate judge's findings that the mother had not pursued her interest in parenting, C.M., that there was not a significant parent—child bond, and that the likelihood of C.M.'s adoption would be increased if there were no intervening parental rights to overcome in a future adoption petition.

has not appealed the determination to waive her consent to adoption of that child.

4. There was testimony from a social worker and an official of the Family Division that because the child was under the jurisdiction of the District of Columbia he could not accompany his mother to Georgia, and that the agency could not offer services in Georgia because it has no jurisdiction there.